

# NUMBER 13-12-00673-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**UNION PACIFIC RAILROAD COMPANY,** **Appellant,**

**v.**

**WILLIAM R. NAMI,** **Appellee.**

---

### On appeal from the 267th District Court
### of DeWitt County, Texas.

---

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Rodriguez and Garza
### Memorandum Opinion by Justice Rodriguez

In this workplace safety case concerning West Nile virus-carrying mosquitoes, appellant Union Pacific Railroad Company challenges the jury's verdict in favor of appellee William R. Nami on his claim under the Federal Employers' Liability Act (FELA). *See* 45 U.S.C. § 51 (2006). By two issues, Union Pacific argues that: (1) the trial court

erred in denying its motion for judgment notwithstanding the verdict because under the doctrine of *ferae naturae* and the common law, Union Pacific owed no legal duty to Nami to protect him from mosquitoes; and (2) the evidence was legally insufficient to prove that any breach by Union Pacific caused Nami to contract West Nile virus. We affirm.

## I. Background

Nami sued Union Pacific under FELA for failing to provide him a safe workplace. Nami alleged that he contracted West Nile virus and encephalitis from mosquitoes at his Brazoria County worksite and that he has suffered past injuries and will continue to suffer injuries as a result of those infections. Nami alleged that his injuries were caused by Union Pacific's negligence. Nami's claim was tried to a jury.

### A. Relevant Evidence

#### 1. Sarah Nami

At trial, Nami's daughter, Sarah, testified that she lived with her parents at the time her father contracted West Nile virus. She testified that on October 22, 2008, she came home from work to find her father slumped over on the couch. She took his temperature, and he had a fever of 103 degrees. Sarah testified that her father was sweating and mumbling incoherently. She called her mother, who rushed home from work, and the two women lifted Nami off the couch. Her mother took Nami to the emergency room. It was eventually determined that Nami was infected with West Nile virus and had developed encephalitis as a result.[1]

---

[1] The evidence showed that encephalitis is a swelling and inflammation of the brain that causes fever, delirium, and, potentially, long-term effects of cognitive and memory impairment.

Sarah testified that her father has continued to suffer symptoms since his hospitalization. She testified that "he has not been the same since." Sarah testified that before her father became sick, he was an incredibly strong and alert man. She testified that he is now very weak and that she and her mother must assist him in his every-day activities. Her father walks with a cane; he cannot drive; he is very forgetful; he has little stamina for activities outside the home. Her father cannot accomplish any of the physical tasks for which he was previously responsible, such as yard work and home repairs. Sarah testified that her father's weakened state greatly frustrates him and is a tremendous burden on the family.

### 2. Nami

Nami testified that he has worked for the railroads for over thirty years, mainly maintaining the track with heavy equipment. Nami testified that this was "hard physical work" but that he enjoyed it and it paid well. There was evidence that Nami initially worked for Southern Pacific Railroad, but that he has been working for Union Pacific since at least the 1990s. The duration and status of Nami's employment with Union Pacific was not a contested issue at trial.

Nami testified that from July to October 2008, he and his crew worked on a stretch of track outside Sweeny, Texas, which was in Brazoria County. Nami described his work day as follows. He left his home in Cuero, Texas in the early morning, drove to Union Pacific's site in Bloomington, Texas, and clocked in around 6:45 a.m. At Bloomington, there was a morning conference call with other work crews from the area, during which a "rule of the week" from the safety rulebook was read to the crews. At Bloomington,

3

appellant also participated in warm-up calisthenics and assisted his crew in loading their truck. Nami and his crew then drove to Sweeny; the crew typically arrived there around 10:00 a.m. They would work on the track for several hours before stopping for the day around 2:30 p.m. and driving back to Bloomington. "[Q]uitting time" was at 3:30 p.m.

Nami testified that Union Pacific required its workers to attend monthly safety meetings. From October 2007 to October 2008, he attended six of these meetings. Nami testified that he missed safety meetings only if his supervisor had required him to be elsewhere at the time of the meeting. Nami's counsel introduced and admitted as an exhibit an Accident Prevention Bulletin issued by Union Pacific in May 2008, which included a warning about West Nile virus. Nami testified that he never saw that bulletin. He testified that "the subject of West Nile virus" or mosquitoes was never "discussed with [him] before [he] got sick." He testified that before he became ill, he knew nothing about West Nile virus or "any disease that was transmitted by mosquito[e]s." He never considered mosquitoes a "danger to [his] health." When asked "what is the worst thing that you thought would happen to you if you got bit by a mosquito," Nami answered, "Maybe a little sting, maybe a little scratch."

Nami admitted that all safety bulletins were kept in the "rule book[s]" that were supposed to be kept in the work trucks. He agreed to the following statement by defense counsel: "You could read the rule book every couple of days or read parts of it if you chose to. I'm not saying you had to, I'm just saying it is an option that somebody had." Nami also testified that the crews did not always carry the rule books in their trucks: "You can't carry a book that thick with you. You know, you can't—supposed to have it with

4

you, but you can't do nothing, there's no place to put them. They get tore up, they get, you know." Nami testified that he did not use bug spray and wore short sleeve shirts when he was working outside. He testified that Union Pacific was "supposed to" supply the workers with bug spray, but did not. He testified that if he had known about the threat of West Nile virus, he would have used bug spray and worn long sleeve shirts.

Nami then testified specifically about the work he performed at his crew's site outside Sweeny. Nami testified that although he typically operated a ballast regulator at his work sites, in Sweeny, he was working with a tamper machine. A tamper is a piece of gas-powered heavy machinery that "tamp[s]" down the rail ties; the operator of the tamper sits inside a cab. Nami testified that the tamper he operated at the Sweeny site was "junk." He testified that Union Pacific "send[s] the older machines this way south and they keep the newer machines up north and you just have to make do with them." Nami testified that the door on the tamper he operated did not shut completely and that there were holes in the floor and walls of the machine. He testified that although he could turn on the air-conditioning in the cab, it did not function effectively. He testified that the inside of the tamper's cab was so humid and damp that water collected and dripped from the ceiling. He testified that he has experience with new tampers and that the cab of a new, or properly maintained, machine is sealed from outside conditions.

Nami testified that he reported the problems with the tamper to his supervisor, but that when reports are submitted, supervisors "don't want them[,] . . . they don't want to look at that stuff." Nami testified that the railroad did not make repairs reliably:

> When the mechanic came around, that was like cross your fingers and hope
> they do. You'd tell them about it, and if they decided they want to fix it, they

5

fixed it. If not, they went on down the road and that's just the way it was. You put a work order in on it, you just cross your fingers again and hope they come down, unless it's totally broke down and can't work.

Nami testified that when the crew exited their truck at their Sweeny worksite, they would be immediately swarmed and bitten by mosquitoes. Nami then walked through high weeds to his tamper machine. He testified that during the four months he worked at that site, Union Pacific never mowed the tall grass and weeds present at the site. Nami testified more specifically about the weeds:

Q: The railroad have weed mowers?

A: I think contract.

Q: They contract the weed mowing.

A: Yes, sir.

Q: Did they ever mow those weeds?

A: Not when I was there.

Q: Did you ever see the railroad spraying those weeds?

A: No, sir.

Finally, Nami testified that when he opened the door of and climbed into the tamper, he would again be swarmed and bitten by mosquitoes.

Nami testified that in late September 2008, he began experiencing flu-like symptoms—fever, fatigue, and weakness. He continued to go to work even though he felt progressively worse. He testified that in late September and early October, he was increasingly uncomfortable in the heat; he testified that he asked the crew member driving the work truck to turn up the air conditioning during their drives. Nami's symptoms

6

reached a critical point on October 22, 2008, the date his daughter found him collapsed in the living room of their home. Nami testified that he does not remember anything that occurred that day after quitting time.

Nami testified that he was rarely outside when he was at home in Cuero. He testified that, during the time he was working at the Sweeny site, he stayed inside, in the air conditioning, when he arrived home from work and did not go back outside until he walked to his truck to leave for work the next morning. He did not participate in outdoor recreational activities, such as golfing or jogging.

Nami testified that he never noticed mosquitoes in DeWitt County, generally, or Cuero, specifically, during this time period. He testified that he was never swarmed by mosquitoes in Cuero. He testified that because of the intense swarms he encountered in Sweeney, the only time he was aware of mosquitoes was when he was working there.

### 3. Kristy Murray, D.V.M, Ph.D.

Nami's next witness was Kristy Murray, an associate professor in the National School of Tropical Medicine at Baylor College of Medicine in Houston, Texas. Dr. Murray, a veterinarian and epidemiologist, tracks and studies mosquito-born tropical diseases, such as West Nile virus and dengue fever. Union Pacific does not dispute that Dr. Murray is an expert in the subject of West Nile virus.

Dr. Murray runs a medical study group at the college of medicine tracking the long-term effects of West Nile virus in over 200 patients who have been infected. Nami is a participant in that study. Because he is a participant, Dr. Murray has access to Nami's medical records. Dr. Murray testified about the typical incubation period for West Nile

7

virus—three to fourteen days—and that the onset and development of Nami's symptoms indicate he was most likely bitten by a West Nile virus-infected mosquito in mid-September 2008. Dr. Murray testified that Nami has suffered permanent damage because of the infection and resulting encephalitis, including cognitive impairment and decreased kidney function.

Dr. Murray testified that West Nile virus is transmitted to humans by the bites of infected mosquitoes. She then testified about the types of mosquitoes that carry the virus and their behavior:

> Q: Can any mosquito transmit West Nile virus or is there a specific mosquito that transmits it?
>
> A: The main mosquito that we look at is what's called the Culex quinquefasciatus, which is also known as the common house mosquito. It's a very prevalent mosquito, likes standing water, tall grass, things like that.
>
> Now, with West Nile virus, there are 64 different species of mosquito[e]s that have tested positive for the virus, so 26 species of Aedes mosquito[e]s, A-e-d-e-s, have also tested positive. But the main transmitter that we think of is going to be the Culex mosquito.
>
> Q: But it can be other mosquito[e]s?
>
> A: It can be, yes.
>
> Q: And you've said that the Culex mosquito is known as the common house mosquito?
>
> A: Correct.
>
> Q: What is that? What is that—why is it known as the common house mosquito?
>
> A: Mostly because during daytime hours they can be found in residential structures or other areas where they go to rest.

8

Q: And will the mosquito, the common house mosquito, i.e., the Culex mosquito, move about if it's disturbed from its resting place?

A: Yes.

Q: Does it lay dormant even when disturbed in the heat?

A: Does it—if it's disturbed in the heat it would probably leave its resting place.

. . . .

Q: Now, these Culex mosquito[e]s, is it accurate that they generally are biting before the sun comes up and after the sun goes down?

A: Correct. That's typically when they're the most active.

. . . .

Q: In your cohort study, have you had any patients who developed West Nile virus from being bitten by mosquito[e]s during the daylight hours?

A: We had—in 2002 when we had our large outbreak of West Nile we had a group of retired golfers who pretty much they all belonged to one single golf course in northwest Harris County and they were out there playing golf in the morning and they reported a lot of grass around the area. The Health Department actually went and investigated the area because there was a lot of standing water as well and they found positive mosquito[e]s attributed to this golf course.

Q: And they were bitten during daylight hours?

A: In the morning, yes, but it was during daylight, yes.

. . . .

Q: Does the Culex mosquito have to be in water?

A: It has to breed in water.

Q: But does it live in water?

9

A:      No.  I mean, the larvae does, but not the mosquito itself.  It lays eggs into the water and then you see larvia [sic] emerge, and it's typically stagnant water that you see that happen.

Q:      Does the Culex mosquito nest in a dark, damp environment?

A:      Yes.

Q:      Such as your car?

A:      It can.

Q:      What about high grass and weeds?

A:      It can.

Dr. Murray testified about several outbreaks of West Nile virus in the Harris County, or Houston, area.   The first outbreaks in Harris County occurred in 2002, 2003, and 2004.  Dr. Murray testified that "there was a lot of media attention about" those outbreaks but "then as we started to drop off in terms of our number of cases, the interest by the media also dropped off."   According to Dr. Murray, the next outbreak that garnered significant media attention was occurring at the time of trial, or August 2012.

Dr. Murray testified that in order to track these outbreaks, the State of Texas and other governmental entities set up mosquito surveillance traps.  She testified that in June, July, and August of 2008, fifteen mosquito pools in Brazoria County tested positive for West Nile virus-carrying Culex mosquitoes.  She testified the surveillance maps "showed [the positive tests in Brazoria County] going through August and then after that they didn't show any positive.   But I'm assuming, because I just know what happened in Houston, that when Hurricane Ike hit[,] people were having to be pulled to do different things, to respond to the hurricane."   In short, Dr. Murray assumed that the mosquito

10

surveillance stopped during September because the people performing the surveillance were diverted to disaster-relief activities. When asked whether "there were any positive mosquito pools in DeWitt County in 2008," Dr. Murray answered, "I didn't see any in the surveillance map, no."

### 4. Kathryn Nami

Kathryn Nami, Nami's wife, testified that Nami rarely spent time outdoors when he was not at work. She testified that "[b]ecause he's been out in the heat pretty much all day[,] . . . he wants to be in the air conditioning when he gets home." Kathryn testified that their family did not spend any time on the Texas coast in the summer of 2008. She testified that in September 2008, they did not "battle any significant mosquito[e]s . . . in Cuero." She testified that during that time, they "didn't get a lot of rain. It was a drought."

### 5. Daniel Dugi, M.D.

Dr. Dugi has been a family medicine practitioner in DeWitt County since 1983. He has known and treated the Nami family for approximately twenty years. Dr. Dugi treated Nami's encephalitis. He testified that based on the family's description of Nami's work site, he ordered a test for West Nile virus, which came back positive. Dr. Dugi testified that he has continued to treat Nami after his release from the hospital and that, in the ensuing years, Nami has suffered continued damage, including memory loss, unsteadiness, muscle weakness, and decreased kidney function.

Dr. Dugi testified that, "to [his] knowledge," there was no West Nile virus in DeWitt County in 2008. He testified he would have been aware of a threat of West Nile virus in

11

the area because he has "been part of an alert system with the CDC for years and years." During the same time period, he testified that he was aware of cases of West Nile virus "around Houston." Because Nami's family told him that Nami had been working outdoors near Houston, Dr. Dugi's knowledge of the cases around Houston prompted him to order the West Nile test on Nami. Dr. Dugi testified that he had no "reason to believe that [Nami] would have gotten West Nile virus from his activities outside here in Cuero, DeWitt County, Texas." Dr. Dugi admitted that he was not providing "any expert opinion[]" as to "specifically where [Nami] was when he contracted" the virus, but was merely providing "my own opinion" based on the history given to him by Nami and his family. He agreed that he is not "personally familiar" with the results of mosquito surveillance being conducted by the State of Texas in DeWitt County.

Although the trial court initially sustained objections by the defense that Dr. Dugi was not qualified to opine about where Nami was located when he was bitten, the trial court later allowed Nami's counsel to read to the jury the following question answered by Dr. Dugi during an offer-of-proof examination by counsel: "The question asked of Dr. Dugi: And is that your opinion today based in part on the history that [Nami] gave you, that the bite that transmitted the West Nile virus was received by him in Brazoria County? And the answer from Dr. Dugi was yes, sir, that's my opinion."

## B. The Verdict

After the close of evidence, the jury was charged on Nami's claim as follows:

Did the negligence, if any, of those named below legally cause the occurrence in question?

Answer "Yes" or "No" for each of the following:

12

a.     UNION PACIFIC RAILROAD COMPANY        _____

b.     WILLIAM R. NAMI                                      _____

"Negligence" means failure to use ordinary care.   That is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

You are instructed that in order to answer "Yes" to this question for Union Pacific Railroad Company, you must find that William R. Nami contracted West Nile virus while in the course and scope of his employment for Union Pacific Railroad Company, that Union Pacific Railroad Company was negligent in the manner or extent it provided to William R. Nami warnings/instructions about mosquito[e]s or made available to William R. Nami mosquito spray, and that said negligence was a cause, in whole or in part, of William R. Nami's contracting West Nile virus.

The Federal Employer's Liability Act does not require a defendant to insure its employee's safety, or the safety of their workplace.   Nor is the defendant required by this law to anticipate or imagine every possible circumstance. Railroad work involves a certain degree of danger and it is not possible for the defendant to eliminate all potential sources of danger or injury.   The defendant is only required to use the level of care which is reasonable under the circumstances.   The basis for liability, if any, is a negligent act by the defendant and not the mere fact that a disease occurred while the plaintiff was employed.   Further, defendant's negligence must have been a cause, in whole or in part, of plaintiff's disease, or plaintiff may not recover.

"Ordinary care" means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.

"Legal Cause."   Negligence is a legal cause of damage if it played any part, no matter how small, in bring[ing] about or actually causing the injury or damage.   Negligence may be a legal cause of damage even though it operates in combination with the act of another, or some natural cause, or some other cause, if the negligence played any part, no matter how small, in causing the damage.

The jury found both Union Pacific and Nami negligent, apportioning 80% of the responsibility to Union Pacific and 20% to Nami.   The jury's damages totaled $940,000:

13

$180,000 for past loss of earning capacity; $300,000 for future loss of earning capacity; $100,000 for past physical pain and mental anguish; and $360,000 for future physical pain and mental anguish.[2]

Union Pacific filed a motion for judgment notwithstanding the verdict. In the motion, Union Pacific challenged, in relevant part, the existence of its legal duty to Nami and the evidence supporting the jury's verdict. The trial court denied Union Pacific's motion. In its final judgment, the trial court awarded Nami $752,000[3] in damages, post-judgment interest, and costs.

## II. Motion for Judgment Notwithstanding the Verdict

By its first issue, Union Pacific challenges the trial court's denial of its motion for judgment notwithstanding the verdict, arguing that under the doctrine of *ferae naturae* and the common law, it owed no legal duty to Nami to protect him from mosquitoes.

### A. Standard of Review

"[U]pon motion and reasonable notice[,] the court may render judgment non obstante veredicto if a directed verdict would have been proper . . . [and] disregard any jury finding on a question that has no support in the evidence." TEX. R. CIV. P. 301. Specifically, judgment notwithstanding the verdict is proper if a legal principle precludes recovery or the evidence was legally insufficient to support the jury's findings. *See Houston Med. Testing Servs., Inc. v. Mintzer*, 417 S.W.3d 691, 695 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *see also ex Parte City of Corpus Christi*, 427 S.W.3d 400, 404

---

[2] The jury awarded no damages for past and future physical impairment.

[3] This represents eighty percent of the total damages awarded, which corresponds with the eighty percent responsibility apportioned by the jury to Union Pacific.

(Tex. App.—Corpus Christi 2013, pet. denied). A legal principle precludes recovery "when the record demonstrates that a theory of liability found by the jury is barred as a matter of law." *Mintzer*, 417 S.W.3d at 695.

## B. Ferae Naturae

In its first argument, Union Pacific relies on the doctrine of *ferae naturae*, which holds that landowners are not generally liable for the acts of indigenous animals on their property. *Nicholson v. Smith*, 986 S.W.2d 54, 60 (Tex. App.—San Antonio 1999, no pet.). Under that doctrine, landowners may retain a duty to warn if they take affirmative or negligent actions that bring the animals onto the property or draw them to the area. *Id.* at 62. Union Pacific argues that this landowner duty extends to employees because "Texas courts have held that the duty of an employer to provide a reasonably safe workplace for employees is, in all material respects, the same as the duty of a landowner to use reasonable care to make his premises safe for invitees." Thus, Union Pacific argues, because mosquito[e]s are indigenous, wild animals, it had no duty to Nami to protect him or warn him about the threat posed by the mosquitoes.

Assuming without deciding that the doctrine of *ferae naturae* applies to an employer's duty to provide a reasonably safe workplace, there was evidence at trial that Union Pacific's negligent acts created the conditions that attracted the mosquitoes to Nami's Sweeny worksite. Nami testified that he reported the condition of his tamper machine—a door that would not shut, malfunctioning air-conditioning, holes in the floor and walls—to his supervisor and that nothing was done to fix it. There was evidence that because the cab of Nami's tamper was exposed to the elements, it was so damp that

15

water dripped from the ceiling. Nami also testified that in the four months he worked at the Sweeny site, Union Pacific's contract mowers never came to mow the tall grass and weeds that surrounded the track and equipment. Dr. Murray testified that the mosquitoes that are most responsible for the transmission of West Nile virus—Culex mosquitoes—nest in dark, damp places. She also testified that they can nest in high grass and weeds. Dr. Murray testified that although the Culex mosquito typically lies dormant in the heat of the day, "if it's disturbed in the heat[,] it would probably leave its resting place."

In short, there was evidence that the tamper's state of disrepair allowed mosquitoes to both enter and/or nest in the cab. The high grass and weeds at the worksite, which were never mowed in the four months that Nami's crew worked there, provided a further nesting place for mosquitoes. Failing to repair Nami's equipment or mow the grass and weeds were negligent acts by Union Pacific that created conditions that allowed mosquitoes to swarm and bite Nami. Thus, under the facts of this case, we cannot conclude that the doctrine of *ferae naturae* precludes Nami's recovery. Because there was evidence that Union Pacific negligently created the conditions that attracted the mosquitoes, Union Pacific retained a duty to warn. *See Nicholson*, 986 S.W.2d at 62; *see also Mintzer*, 417 S.W.3d at 695. The trial court did not err in denying Union Pacific's motion for judgment notwithstanding the verdict on this basis.

## C. Common Law Duty to Warn of Commonly-Known or Common Sense Hazards

Union Pacific's second argument is based on the general common law. Union Pacific argues that, under the common law, it owes no duty to warn Nami of commonly-

16

known or common-sense hazards, which Union Pacific claims includes mosquitoes. *See Brookshire Grocery Co. v. Goss*, 262 S.W.3d 793, 795 (Tex. 2008). Specifically, Union Pacific argues that it is commonly known that mosquitoes carry diseases, and the evidence shows that Nami was aware that there were many mosquitoes at his Sweeny worksite. We are not persuaded by this argument.

Texas courts have held that an employer owes no duty to warn an employee of hazards that are commonly known or already appreciated by the employee unless there is evidence that the work is unusually precarious. *See Kroger Co. v. Elwood*, 197 S.W.3d 793, 794–95 (Tex. 2006) (holding that a grocery store employer had no duty to warn an employee that placing his hand in the doorjamb of a customer's car is an obvious danger); *see also Jack in the Box, Inc. v. Skiles*, 221 S.W.3d 566, 569 (Tex. 2007) (holding that a fast-food employer had no duty to warn an employee that it was obviously dangerous to use a ladder to climb over a lift gate); *Aleman v. Ben E. Keith Co.*, 227 S.W.3d 304, 311, (Tex. App.—Houston [1st Dist.] 2007, no pet.) (holding that a restaurant supply employer had no duty to warn a delivery truck driver employee of the danger associated with water on a floor because that is a commonly known hazard and obvious to everyone). Nami's case is clearly distinguishable. First, the record in this case does not demonstrate that it is common or obvious knowledge that mosquitoes carry and transmit diseases. *See Mintzer*, 417 S.W.3d at 695 (providing that a legal theory precludes recovery "when the record demonstrates that a theory of liability found by the jury is barred as a matter of law"). There is no evidence in the record that mosquitoes generally carry diseases. And with regard to West Nile virus, in particular, the only relevant evidence at trial showed

17

that public attention to the risk of the disease was low in September 2008. Nami testified that he had no knowledge of the threat of West Nile virus-carrying mosquitoes. Dr. Murray testified that the last local media attention to the disease was during the 2004 outbreak in Harris County. And it was not until the time of trial that public interest peaked again.

Moreover, that mosquitoes may carry diseases is not the sort of obvious hazard presented by the above cases, *i.e.*, a person could reasonably expect an injury to result from placing your hand in a car doorjamb, climbing a ladder that is propped against a moving gate, or water on the floor of a refrigerated food trailer. We agree that these are commonly-known or common sense hazards. We cannot agree that the risks posed by mosquitoes are so obvious. The diseases transmitted to humans by mosquitoes—for example, malaria, St. Louis encephalitis, Eastern and Western Equine encephalitis—are rare,[4] and thus, the likelihood is low that a person in Texas would know someone who has contracted a mosquito-borne illness. Even assuming that it is common knowledge that mosquitoes can carry disease, because of the rare instances of those diseases, we cannot conclude it is common knowledge that a person will actually contract one of those diseases.

---

[4] *See* Centers for Disease Control & Prevention, *About Malaria*, http://www.cdc.gov/malaria/about/ (last visited Aug. 7, 2014) ("About 1,500 cases of malaria are diagnosed in the United States each year. The vast majority of cases in the United States are in travelers and immigrants returning from countries where malaria transmission occurs, many from sub-Saharan Africa and South Asia."); Centers for Disease Control & Prevention, *Saint Louis Encephalitis: Frequently Asked Questions*, http://www.cdc.gov/sle/general/qa.html (last visited Aug. 7, 2014) ("St. Louis encephalitis is a rare disease that is caused by a virus spread by infected mosquitoes."); Centers for Disease Control & Prevention, *Eastern Equine Encephalitis*, http://www.cdc.gov/easternequineencephalitis/ (last visited Aug. 7, 2014) ("Eastern equine encephalitis (EEE) is a rare illness in humans, and only a few cases are reported in the United States each year.").

We conclude that, under the facts of this case, Union Pacific failed to show that mosquitoes pose a commonly-known or obvious hazard. The record simply does not demonstrate that the jury's negligence finding is barred by this common law principle. Union Pacific's duty to warn Nami therefore remained, and the trial court did not err in denying its motion for judgment notwithstanding the verdict because a directed verdict would not have been proper on this basis. *See* Tex. R. Civ. P. 301; *Mintzer*, 417 S.W.3d at 695.[5]

## D. Summary

We conclude that the trial court did not err in denying Union Pacific's motion for judgment notwithstanding the verdict. Union Pacific's first issue is overruled.

### III. Sufficiency of the Evidence

By its second issue, Union Pacific argues that Nami failed to produce legally sufficient evidence that he contracted West Nile virus while he was at work.

## A. Standard of Review

The evidence is legally insufficient if reasonable and fair-minded jurors could not have reached the verdict they did. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In reviewing the sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support

---

[5] Union Pacific's final argument is a general policy argument, that affirmance in this case "would establish an unprecedented duty for railroads to shield employees from nature by warning them about mosquitoes and providing them with company-supplied mosquito repellant." We disagree that this burden is as enormous as Union Pacific portrays it to be. Indeed, there was evidence at trial that Union Pacific has committed in the past to providing bug repellant to those employees wishing to use it, but that bug repellant was not made available to appellant and his crew. The remainder of Union Pacific's contentions in this final argument merely rehash the points it made above, which we have already addressed. *See* Tex. R. App. P. 47.1.

19

the challenged finding; we credit favorable evidence if a reasonable fact finder could and disregard contrary evidence unless a reasonable fact finder could not. *Id.* at 823, 827. We do not substitute our judgment for that of the trier of fact if the evidence falls within this zone of reasonable disagreement. *Id.* at 822. "We will uphold the jury's finding if more than a scintilla of competent evidence supports it." *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009).

## B. Applicable Law

> Under FELA, every railroad engaging in interstate commerce is liable in damages to any employee injured during his employment when such injury results in whole or in part from the railroad's negligence or by reason of any defect or insufficiency due to its negligence. *See* 45 U.S.C. § 51 []. Plaintiffs must prove the common-law elements of negligence, duty, breach, foreseeability and cause-in-fact; however, under FELA, the plaintiff carries only a slight burden on causation. *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 168 (Tex. 2002). Accordingly, the test of causation is whether the proof justifies, within reason, the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which the claimant seeks damages. *Rogers v. Missouri Pacific Ry.*, 352 U.S. 500, 507 [] (1957). . . . Despite the lower burden under FELA, a plaintiff still bears the burden of presenting evidence from which a jury could conclude the existence of a probable or likely causal relationship as opposed to merely a possible one. *Edmonds v. Illinois Cent. Gulf R.R. Co.*, 910 F.2d 1284, 1288 (5th Cir. 1990).

*Abraham v. Union Pac. R.R. Co.*, 233 S.W.3d 13, 17 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).

## C. Analysis

The evidence at trial showed that Nami succumbed to severe encephalitis symptoms on October 22, 2008. It is undisputed the encephalitis was caused by a West Nile infection. Dr. Murray testified that based on this date and the onset and progression of Nami's flu-like symptoms, Nami was most likely bitten by a West Nile virus-infected

mosquito in mid-September 2008.

The evidence further showed that during September 2008, Nami spent hardly any time outdoors, except at his Sweeny worksite in Brazoria County where he worked in the tamper machine from approximately 10 a.m. to 2:30 p.m. every day. Nami testified, and his wife confirmed, that while he was assigned to the Sweeny site, Nami spent almost all of his off-work time inside his air-conditioned home in Cuero. The remainder of the time that Nami was not in Sweeny, he was either driving to and from home and Bloomington in his air-conditioned truck or to and from Bloomington and Sweeny in his work crew's air-conditioned truck. Although Union Pacific points to testimony that Nami spent time outdoors in the evenings in Cuero working in the yard or attending high school football games, it is clear from the context that this testimony referred to an earlier time period, before the summer of 2008.

Nami testified that the only time he was aware of mosquitoes during this time period was at his worksite in Sweeny. He testified that as soon as he and his crew exited their truck, they were swarmed and bitten by mosquitoes from the tall grass and weeds around the track. He testified that he then encountered another swarm of mosquitoes when he opened the door of and climbed into the cab of his tamper machine. Both Nami and his wife testified that they remembered no significant mosquito activity in Cuero or DeWitt County in September 2008.

Dr. Murray testified that West Nile virus is transmitted to humans by the bites of infected mosquitoes. She testified that the "main mosquito" that carries and transmits West Nile virus is the Culex mosquito, which usually nests during the day and "generally

21

[bites] before the sun comes up and after the sun goes down." She testified that although the Culex mosquito is "typically . . . most active" at dawn and dusk, it could "leave its resting place" if "disturbed" during the heat of the day. In addition to the Culex mosquito, Dr. Murray testified that twenty-six other species of Aedes mosquito have tested positive for West Nile virus.

Dr. Murray testified that in the summer of 2008, surveillance maps showed that fifteen mosquito pools in Brazoria County tested positive for West Nile virus-carrying Culex mosquitoes. During this same time, there were no positive tests on the surveillance map for DeWitt County. Although he agreed that he is not personally familiar with the surveillance testing being performed in DeWitt County, Dr. Dugi confirmed that to his knowledge, there was no West Nile virus in DeWitt County during this time period. Dr. Dugi further testified that he would have been aware of West Nile virus in DeWitt because he is involved in a CDC virus alert system. Based on Nami and his family's descriptions of Nami's activities in the months leading up to his diagnosis, Dr. Dugi concluded that it was his opinion that "the bite that transmitted the West Nile virus was received by [Nami] in Brazoria County."

Union Pacific argues that Dr. Murray's testimony establishes that the "mosquito known to transmit West Nile virus in Brazoria County bites at dawn and dusk." Therefore, Union Pacific argues, Nami could not have contracted West Nile in Brazoria County because he was only outdoors there during mid-day. We disagree that Dr. Murray's testimony definitely established this; contrary to Union Pacific's assertions, these were not "undisputed" facts. Dr. Murray's testimony about the behavior of the Culex

22

mosquito was given in terms of generalities and typicalities; she also testified that the Culex mosquito could bite if disturbed from its resting place during the daylight hours. And crucially, Dr. Murray testified that another group of West Nile virus-positive patients from her study likely contracted the virus while playing golf during the morning daylight hours. From this, the jury could have reasonably concluded that the Culex mosquito could have bitten Nami during the daylight hours when they were disturbed from their nesting places in the tall grass around the tracks and damp cab of his tamper machine.

Considering the evidence in the light most favorable to the verdict and indulging every reasonable inference in support thereof, we conclude that the evidence at trial was legally sufficient to establish that Nami probably contracted West Nile virus at his worksite in Brazoria County. *See City of Keller v. Wilson*, 168 S.W.3d at 827. Reasonable and fair-minded jurors could have reached the verdict in this case; in light of the evidence outlined about, we cannot conclude that the jury "simply guess[ed]." Union Pacific's second issue is overruled.

## IV. Conclusion

We affirm the judgment of the trial court.


                                                          NELDA V. RODRIGUEZ
                                                          Justice

Delivered and filed the 14th
day of August, 2014.


23