# IN THE SUPREME COURT OF TEXAS

═══════════════
No. 14-0901
═══════════════

UNION PACIFIC RAILROAD COMPANY, PETITIONER,

v.

WILLIAM NAMI, RESPONDENT

═══════════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS
═══════════════════════════════════════════════════════════

**Argued November 3, 2015**

CHIEF JUSTICE HECHT delivered the opinion of the Court, in which JUSTICE GREEN, JUSTICE WILLETT, JUSTICE GUZMAN, JUSTICE LEHRMANN, JUSTICE BOYD, JUSTICE DEVINE, and JUSTICE BROWN joined.

JUSTICE JOHNSON filed a dissenting opinion.

A railroad employee who contracted West Nile virus from a mosquito bite contends that his employer is liable for damages under the Federal Employers' Liability Act ("FELA"),[1] which requires railroads to provide their employees reasonably safe places to work. FELA liability is generally based on common-law negligence principles. One well-established principle, part of the doctrine of *ferae naturae*, limits a property owner's liability for harm from indigenous animals that he has not attracted to the property. In the circumstances presented, we conclude that the doctrine

---

[1] 45 U.S.C. §§ 51–60.

applies and precludes the railroad's liability. We reverse the judgment of the court of appeals[2] and render judgment for petitioner.

# I

In September and October 2008, William Nami, age 58, a 32-year employee of Union Pacific Railroad, was operating a tamping machine in Brazoria County. The tamper was a very large, complex piece of equipment, similar in size to a railroad boxcar, and weighing many tons. It was parked on a siding off the main track near Sweeny, a small town in Brazoria County about 55 miles west of Galveston and about 20 miles from the Gulf of Mexico. Nami lived in Cuero, a small town in DeWitt County about 140 miles west of Galveston and about 50 miles north of the Gulf. Each morning he would drive some 45 miles south to Union Pacific offices in Bloomington, where he attended meetings, including safety meetings. His crew would then drive some 85 miles east, roughly parallel to the coast, to Sweeny, arriving around 10:00 a.m. He and the crew would do maintenance work on the tamper on the siding until directed to move it to the main track and drive it to the area where it was needed. When the tamper arrived at the appointed worksite, Nami would move it very slowly down the railroad tracks, lifting up the track to level it, packing the ballast beneath the crossties, and tamping each tie to firm support for the tracks. Nami operated the tamper from inside a large cab on the machine while another worker outside the machine watched to make sure the track stayed level, and the two took turns. A skilled operator could repair about a mile of track in a

---

[2] ___ S.W.3d ___ (Tex. App.—Corpus Christi-Edinburg 2014).

workday. Nami would finish each day in time to return to Bloomington with his crew by 3:30 p.m., and then drive home.

Sweeny swarmed with mosquitoes. Driving to work there, Nami passed a sign calling Sweeny the "mosquito capital of the world."[3] And Hurricane Ike, which made landfall over Galveston on September 13, 2008, drenching Brazoria County and all of South Texas, only made matters worse. Nami did not notice mosquitoes at his home in Cuero, but he did at work. The railroad right-of-way at the Sweeny siding was narrow and covered in weeds and high grass and sometimes pools of water. Nami was regularly bitten repeatedly as he worked on the tamper.[4] He was also bitten by mosquitoes inside the tamper cab. The cab had holes in its walls and floor, its door did not close properly, and its air conditioner did not work. Nami complained to his superiors of these conditions to no avail.

Union Pacific knew about the mosquito problem and knew that mosquitoes could carry the West Nile virus. The main transmitters, the *Culex* genus, are usually most active at dawn and dusk. Most people infected with the virus experience no symptoms or only minor ones, but some suffer serious symptoms including headaches and fever. Fewer than 1% develop a life-threatening

---

[3] Nearby Clute, another Brazoria County town 23 miles east of Sweeny, claims to be the mosquito capital, if not of the world, at least of Texas. Clute is home for the annual Great Texas Mosquito Festival.

[4] Mosquitoes do not sting. Female mosquitoes have a mouthpart that pierces the skin and siphons off blood. As the biting mosquito feeds, it injects saliva into the skin. Proteins in the saliva trigger a mild immune system reaction in the victim that results in the characteristic itching and bump. *See Mosquito Bites: Causes*, MAYO CLINIC (Oct. 22, 2015), http://www.mayoclinic.org/diseases-conditions/mosquito-bites/basics/causes/con-20032350 (last visited June 23, 2016, copy in case file).

neurological infection leading to encephalitis and meningitis.[5] Union Pacific had warned its employees, beginning in 2002, about the risk of West Nile virus. In May 2008, it issued a bulletin explaining the nature of the virus, the fact that it was spread by mosquitoes, the risk and symptoms of infection, and warning employees to use mosquito repellent. Union Pacific did not furnish mosquito repellent to its employees and did not mow the right-of-way or spray it with pesticide. Because the right-of-way is so narrow, it is doubtful such measures would have helped, as mosquitoes could have flown onto the siding from the surrounding area.

Nami did not see the bulletin, never received the warnings, was unaware of the risks the West Nile virus posed, and took no steps to avoid being mosquito-bitten. In late September 2008, Nami began suffering flu-like symptoms, and after several weeks, as his condition steadily worsened, he was diagnosed with West Nile virus and encephalitis. Complications from the virus prevented Nami from returning to work and resulted in long-term health problems.

Nami sued Union Pacific under FELA for failing to provide a safe workplace. Union Pacific denied that it was negligent in failing to provide a safe workplace and that Nami had been bitten at work. Nami's trial expert testified that in Brazoria County in 2008, 15 pools of mosquitoes tested positive for the West Nile virus, adding that it was hard to say whether that number was high or low. Brazoria County comprises 1,597 square miles. She also testified that the Health Department reported only one other person in the county (population 301,228 in July 2008) tested positive that year.

---

[5] *See West Nile virus: Symptoms and causes*, MAYO CLINIC (Dec. 16, 2015), http://www.mayoclinic.org/ diseases-conditions/west-nile-virus/symptoms-causes/dxc-20166291 (last visited June 23, 2016, copy in case file).

The jury was instructed that they could find Union Pacific negligent only "in the manner or extent it provided [Nami] warnings/instructions about mosquitos or made available to [Nami] mosquito spray". The jury was also instructed that Union Pacific's negligence need only have been "a cause, in whole or in part" of Nami's disease. A jury found that both Union Pacific and Nami negligently caused his disease, attributing 80% responsibility to Union Pacific and 20% to Nami. The trial court rendered judgment on the verdict, awarding Nami $752,000 in damages.

On appeal, Union Pacific argued that under the common-law doctrine of *ferae naturae*, it owed Nami no legal duty to protect him from mosquitoes.[6] The court of appeals held that even if the doctrine applied, a matter it did not decide, Union Pacific was still liable for negligence because it had "created the conditions that attracted the mosquitoes to Nami's Sweeny worksite" by not repairing the tamper cab and not mowing the right-of-way.[7] Accordingly, the court affirmed the judgment for Nami.

We granted Union Pacific's petition for review.[8]

## II

FELA provides in pertinent part that "[e]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . resulting in whole

---

[6] Union Pacific also argued that there was no evidence Nami was bitten at work.

[7] ___ S.W.3d ___, ___ (Tex. App.—Corpus Christi-Edinburg 2014).

[8] 58 Tex. Sup. Ct. J. 1601 (Sept. 4, 2015).

or in part from the negligence . . . of such carrier . . . ."[9] FELA thus imposes on railroads the duty to use reasonable care in providing their employees a safe workplace.[10]

The causation element of a FELA action is a sharp departure from the common-law requirement of proximate cause. The United States Supreme Court in *CSX Transportation, Inc. v. McBride* recently explained:

> FELA's language on causation . . . is as broad as could be framed. Given the breadth of the phrase "resulting in whole or in part from the [railroad's] negligence," and Congress' humanitarian and remedial goals, . . . in comparison to tort litigation at common law, a relaxed standard of causation applies under FELA. . . . Under FELA the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought.[11]

But with respect to FELA's liability element, the Supreme Court explained in *Consolidated Rail Corp. v. Gottshall* that while "Congress' goal in enacting [FELA was] alleviating the physical dangers of railroading",[12]

> FELA is . . . not . . . a workers' compensation statute. . . . FELA does not make the employer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur. And while what constitutes negligence for the statute's purposes is a federal question, we have made clear that this federal question generally turns on principles of common law: [FELA] is founded on common-law concepts of negligence and injury, subject to such qualifications as Congress has imported into those terms. Those qualifications . . . are the modification or abrogation of several common-law defenses to liability, including

---

[9] 45 U.S.C. § 51.

[10] *Atchison, Topeka & Santa Fe Ry. v. Buell*, 480 U.S. 557, 558 (1987) ("A railroad has a duty to use reasonable care in furnishing its employees with a safe place to work. That duty was recognized at common law, [and] is given force through [FELA] . . . .").

[11] 564 U.S. 685, 691–692 (2011) (internal citations, alterations, and quotation marks omitted except as shown).

[12] 512 U.S. 532, 556 (1994).

6

contributory negligence and assumption of risk. Only to the extent of these explicit statutory alterations is FELA an avowed departure from the rules of the common law. Thus, although common-law principles are not necessarily dispositive of questions arising under FELA, unless they are expressly rejected in the text of the statute, they are entitled to great weight in our analysis.[13]

In *Gottshall*, a railroad employee sued under FELA for negligent infliction of emotional distress for having witnessed a coworker and friend die from heat, humidity, and heavy exertion on the job.[14] In defining the cause of action of negligent infliction of emotional distress, the court of appeals had refused to follow common-law principles and instead developed its own.[15] The Supreme

---

[13] *Id.* at 543–544 (internal citations, alterations, and quotation marks omitted). The dissent misreads *McBride* to say that FELA requires a railroad to protect its employees from all reasonably foreseeable dangers. *Post* at __. This reading ignores *McBride*'s reliance on *Gottshall*—specifically for authority in the passage quoted above—which observed that "[c]onditioning liability on foreseeability . . . is hardly a condition at all", and refused to do so. *Gottshall*, 512 U.S. at 553. The dissent focuses on another passage in *McBride,* discussing FELA's liability element, not the causation element:

> Reasonable foreseeability of harm . . . is indeed an essential ingredient of FELA negligence. The jury, therefore, must be asked, initially: Did the carrier fail to observe that degree of care which people of ordinary prudence and sagacity would use under the same or similar circumstances? In that regard, the jury may be told that the railroad's duties are measured by what is reasonably foreseeable under like circumstances. Thus, if a person has no reasonable ground to anticipate that a particular condition would or might result in a mishap and injury, then the party is not required to do anything to correct the condition. If negligence is proved, however, and is shown to have *played any part*, *even the slightest*, *in producing the injury*, then the carrier is answerable in damages even if the extent of the injury or the manner in which it occurred was not probable or foreseeable.

*McBride*, 564 U.S. at 703–704 (internal citations, alterations, and quotation marks omitted). From this, the dissent concludes that "reasonable foreseeability is the touchstone for measuring a railroad's duty under FELA". *Post* at __. But the Supreme Court was discussing not the *extent* of FELA liability but the *limits* on it. Reasonable foreseeability is *necessary* for FELA liability, but it is not *sufficient*. *McBride* makes clear that a railroad's duty to protect its employees from harm is measured by reasonable foreseeability in the sense that it goes no further. To read *McBride* as the dissent does—to impose liability for all reasonably foreseeable harm—all but converts FELA into a worker's compensation statute and makes a railroad the insurer of its employees' safety, directly contrary to *Gottshall*.

[14] 512 U.S. at 536–537.

[15] *Id.* at 550.

Court squarely rejected this approach.[16] "Because FELA is silent on the issue of negligent infliction of emotional distress", the Supreme Court wrote, "common-law principles must play a significant role in our decision."[17] The Supreme Court observed that while "[n]early all of the States have recognized a right to recover for negligent infliction of emotional distress, . . . [n]o jurisdiction . . . allows recovery for all emotional harms . . . ."[18] Rather, "courts have realized that recognition of a cause of action for negligent infliction of emotional distress holds out the very real possibility of nearly infinite and unpredictable liability for defendants", and therefore courts "have placed substantial limitations on the class of plaintiffs that may recover . . . and on the injuries that may be compensable."[19] The Supreme Court identified "[t]hree major limiting tests . . . in the common law": the physical impact test, the zone of danger test, and the relative bystander test.[20] The Supreme Court chose to apply the second test because it was well-recognized in 1908, when FELA was enacted, and "further[s] Congress' goal in enacting the statute of alleviating the physical dangers of railroading."[21]

We track *Gottshall*'s analysis in this case. In applying FELA, we look to the common law, not of Texas or any particular jurisdiction, but in general. The Supreme Court has stated that "[a] railroad has a duty to use reasonable care in furnishing its employees with a safe place to work [that]

---

[16] *Id.* at 550–554.

[17] *Id.* at 544.

[18] *Id.* at 544–545.

[19] *Id.* at 546.

[20] *Id.* at 546–549.

[21] *Id.* at 554, 556.

was recognized at common law, [and] is given force through [FELA]."[22] These fundamental common-law principles apply. First, negligence means the failure to use ordinary care—failing to do what a reasonable person like the defendant would have done under the same or similar circumstances—to protect against unreasonable risk of harm.[23] Second, "an employer's duty to provide a safe workplace . . . always exists",[24] and with regard to conditions on the premises, the duty is identical to that owed by property owners to invitees.[25] And finally, an employer is not an insurer of an employee's safety;[26] there are exceptions to the duty to provide a safe place to work.[27] The questions remaining are whether the common-law doctrine of *ferae naturae* provides such an exception, and how that doctrine applies in this case.

---

[22] *Buell*, 480 U.S. at 558.

[23] *See Gallick v. Balt. & Ohio R.R.*, 372 U.S. 108, 118 n.6 (1963) ("'Negligence is sometimes said to be a failure to observe for the protection of the rights of others that degree of care, precaution, and vigilance which the circumstances justly demand, and sometimes, in other words, it is said that negligence is the failure to observe ordinary care, and ordinary care is that degree of care which people of ordinary prudence and sagacity use under the same or similar circumstances. What would ordinarily prudent persons have done under like circumstances?'" (quoting jury instructions on negligence)); *Ewing Constr. Co. v. Amerisure Ins. Co.*, 420 S.W.3d 30, 37 (Tex. 2014) ("Negligence means the failure to use ordinary care, that is, failing to do that which a reasonable person . . . of the defendant's type would have done under the same or similar circumstances."); RESTATEMENT (SECOND) OF TORTS § 282 (AM. LAW INST. 1965) ("[N]egligence is conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm.").

[24] *Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 201 (Tex. 2015) (internal quotation marks omitted). *See Buell*, 480 U.S. at 558.

[25] *Austin*, 465 S.W.3d at 201–202.

[26] *See Wilkerson v. McCarthy*, 336 U.S. 53, 61 (1949); *Austin*, 465 S.W.3d at 203.

[27] *E.g.*, *Austin*, 465 S.W.3d at 203 (explaining that an employer has no duty to warn an employee of open or obvious hazards).

## III

Human dominion over animals[28] entails, under the common law, responsibility for their actions in some circumstances but not in others. The common law divides animals into two groups: animals *domitae naturae* or *mansuetae naturae*—that is, tame or tamed, domestic animals—and animals *ferae naturae*—that is, wild, usually found at liberty.[29] Insects are treated as wild animals.[30] Broadly speaking, and with various exceptions, the owner of a domestic animal is liable, and sometimes strictly liable, for dangerous propensities of which the owner knows, but usually not for its unexpected actions,[31] while a person who owns, possesses, or harbors a wild animal is strictly liable for its actions.[32] The rule of strict liability is old, dating at least to the 1846 English decision in *May v. Burdett*.[33] "[I]t is important to observe, that the gist of the action is the *keeping* of the animal after knowledge of its mischievous propensities."[34] "The possession of the land does not carry

---

[28] *See Genesis* 1:28 (English Standard Version) ("And God said to them [i.e. man and woman], 'Be fruitful and multiply and fill the earth and subdue it, and have dominion over the fish of the sea and over the birds of the heavens and over every living thing that moves on the earth.'").

[29] *See* RESTATEMENT (SECOND) OF TORTS § 506 (AM. LAW INST. 1977); 4 AM. JUR. 2D *Animals* §§ 62, 67 (2016); 3B C.J.S. *Animals* §§ 2, 319, 332, 334 (2016).

[30] *See* RESTATEMENT (SECOND) OF TORTS § 506 cmt. a; *see also, e.g.*, *Liability of owner or operator of business premises for injuries to patron caused by insect or small animal*, 48 A.L.R.3d 1257 (1973).

[31] *See* 4 AM. JUR. 2D *Animals* §§ 67–74; 3B C.J.S. *Animals* §§ 332–445.

[32] *See* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL & EMOTIONAL HARM § 22 (AM. LAW INST. 2010); RESTATEMENT (SECOND) OF TORTS §§ 507, 514; RESTATEMENT OF TORTS §§ 507, 514 (AM. LAW INST. 1938); 4 AM. JUR. 2D *Animals* §§ 62, 67; 3B C.J.S. *Animals* §§ 319, 332, 334.

[33] (1846) 115 Eng. Rep. 1213; 9 QB 101. *See Spring Co. v. Edgar*, 99 U.S. 645, 651–652 (1978) ("[T]he rule is well settled, that whoever undertakes to keep such an animal [that is, *ferae naturae*] in places of public resort is or may be liable for the injuries inflicted by it on a party who is not guilty of negligence, and is otherwise without fault.").

[34] *Spring Co.*, 99 U.S. at 652 (discussing *May*, 115 Eng. Rep. at 1214) (emphasis in original).

with it possession of the indigenous wild animals which are upon it."[35] "[W]ild animals exist throughout nature, they are generally not predictable or controllable, and therefore, without more, they are neither the property nor the responsibility of the owner or occupier of land on which they are found."[36] A property owner is not generally liable for harm caused by indigenous wild animals on the property.

> Under the doctrine of ferae naturae, a landowner is not liable for the acts of wild animals occurring on the owner's property unless the landowner actually reduced indigenous wild animals to possession or control or introduced nonindigenous animals into the area. A premises owner may not be held to a standard of anticipating or guarding against the presence of animals ferae naturae in relation to invitees unless the owner or possessor has reduced the animals to possession, harbors such animals, or has introduced onto the premises wild animals not indigenous to the locality. The landowner could be negligent with regard to wild animals found in artificial structures or places where they are not normally found, that is, stores, hotels, apartment houses, or billboards, if the landowner knows or should know of the unreasonable risk of harm posed by an animal on its premises, and cannot expect patrons to realize the danger or guard against it.[37]

Thus, as a rule, under the doctrine of *ferae naturae*, a property owner owes an invitee no duty of care to protect him from wild animals indigenous to the area unless he reduces the animals to his possession, attracts the animals to the property, or knows of an unreasonable risk and neither mitigates the risk nor warns the invitee.[38] Ordinarily, the property owner is no better able to protect

---

[35] RESTATEMENT (SECOND) OF TORTS § 508 cmt. a; *see* RESTATEMENT OF TORTS § 508 cmt. a.

[36] 4 AM. JUR. 2D *Animals* § 62.

[37] 3B C.J.S. *Animals* § 325. *See also* GLANVILLE L. WILLIAMS, LIABILITY FOR ANIMALS 336 (1939); WILLIAM NEWBY ROBSON, THE PRINCIPLES OF LEGAL LIABILITY FOR TRESPASSES AND INJURIES BY ANIMALS 72 (1915).

[38] *See Nicholson v. Smith*, 986 S.W.2d 54, 60–61 (Tex. App.—San Antonio 1999, no pet.); *see also* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL & EMOTIONAL HARM § 22 cmt. e; RESTATEMENT (SECOND) OF TORTS §§ 507, 508 cmt. a.

an invitee than the invitee is to protect himself. The same rule applies to an employer's duty to provide a safe workplace. FELA does not exclude the doctrine, and thus under *Gottshall*, *ferae naturae* is entitled to great weight in analyzing Nami's negligence claim. And as in *Gottshall*, there is no reason to exclude the doctrine in determining the extent of Union Pacific's FELA liability. Accordingly, we turn to its application in this case.

**IV**

Mosquitoes are indigenous to Texas and were especially prevalent in South Texas and Brazoria County after Hurricane Ike, when Nami was bitten. Union Pacific could not, of course, and did not, reduce them to its possession. Nami complains that Union Pacific did not mow the right-of-way, but there is no evidence that the tall grass attracted mosquitoes there. Nami also points out that there was sometimes standing water at the siding, but there is no evidence that it was a breeding ground for mosquitoes, or mosquitoes bearing the West Nile virus. Indeed, by Nami's expert's testimony, only 15 pools of captured mosquitoes tested positive for the virus in the whole county of 1,597 square miles, and there is no evidence any infected mosquitoes were found near the siding.

The prevalence of mosquitoes in the Sweeny area was painfully obvious to all. A sign on the highway entering the city proclaimed it "the mosquito capital of the world". The danger of mosquito-borne West Nile virus was well-known to the public. Union Pacific certainly knew of the danger and warned its employees to protect themselves. Mosquito repellent and long-sleeve shirts might have reduced the number of bites, but neither would have prevented infection, and Union Pacific was not obligated to provide either. It issued a safety bulletin to its employees just four months before Nami was infected and discussed it at safety meetings Nami was required to attend. Though he testified

that he did not see the bulletin or hear the warnings, Union Pacific took steps to warn all its employees, even though the risk of infection was small, and the risk of serious infection, like Nami's, was minuscule. Brazoria County's population exceeded 300,000, yet only two cases of West Nile virus were reported in 2008.[39] Nami was more likely to have died in an accidental fire (as did four persons in the county in 2008), accidentally choked to death (as did five persons), or drowned (as did seven persons that year, more than usual, perhaps because of Hurricane Ike), than contract the West Nile virus.[40] Not even Nami's expert could testify that there was an unreasonable danger of disease.[41]

While Nami's liability theories have shifted somewhat during the litigation, his counsel stated at oral argument: "it's not about grass and water; it's primarily and principally about a tamper, a tamper that was complained of." Nami contends that the disrepair of the tamper cab prevented him from excluding mosquitoes. But as Nami testified, mosquitoes swarmed everywhere. They bit him from the moment he left the vehicle that drove him to the siding. While he worked some of the time in the tamper cab, he also did maintenance work outside and took his turn outside the tamper when

[39] The dissent observes that there may have been many more asymptomatic cases of West Nile virus, but the unreasonable risk was not in contracting an infection without even knowing it. *Post* at __. The dissent also speculates that some may have contracted the virus in Brazoria County but reported it elsewhere. *Post* at __. But the record reflects that in all the counties as near to Brazoria as DeWitt, where Nami lived, only 11 serious infections occurred—a lower rate than considering Brazoria County alone.

[40] *See* TEX. DEP'T OF STATE HEALTH SERVS., *Texas Health Data: Deaths of Texas Residents*, available at http://soupfin.tdh.state.tx.us/death10.htm (select year 2008, select "Accidents" in "Cause of Death", and select Brazoria County, then submit query; select "Accidents" to view individual causes of death).

[41] A landowner must warn of or make safe *unreasonably dangerous* conditions. If the condition is not unreasonably dangerous, no warning is required. *See Austin*, 465 S.W.3d at 202.

it was operating. There is no evidence that he was bitten more inside the cab than out, or that if he had not been bitten inside the cab at all, the risk of infection would have been materially less.

Nothing about Nami's job made him more susceptible to contracting West Nile virus than any other person who worked outside all day. Union Pacific did nothing to increase the risk to him. There is no evidence that it could have reduced the risk. There is no evidence that Union Pacific could have done anything to prevent mosquitoes throughout the area from being around its siding and tracks.

Nami relies on four cases as authority for imposing FELA liability on Union Pacific, but in each case, the railroad was liable, not for failing to prevent an insect bite, but for attracting insects to its property, thereby creating the hazard, or failing to remove the attractive conditions when it could do so. In *Gallick v. Baltimore & Ohio Railroad*, the employee was bitten by an insect present because the railroad had known for years that a stagnant pond on the property, surrounded by dead animals, attracted swarms of insects and had not removed it.[42] There was evidence that the employee worked near the pond and that the insect came from there. In *Pehowic v. Erie Lackawanna Railroad*, the railroad knew that a large concentration of bees in the brush near its tracks posed a direct threat to workers in the area but had not removed them and had continued to require employees to work around them.[43] In *Grano v. Long Island Railroad*, the conditions on the railroad's property made it

---

[42] 372 U.S. 108, 109 (1963) ("At the particular stretch of roadbed where petitioner was working on that afternoon, there had been for many years a pool of stagnant water, in and about which were dead and decayed rats and pigeons, or portions thereof. Insects had been seen on, over, and about this stagnant pool, and the evidence showed, as the Court of Appeals stated, that respondent had long been aware of the fetid condition of this pool.").

[43] 430 F.2d 697, 698–699 (3d Cir. 1970).

especially attractive to ticks, one of which bit an employee.[44] And finally, in *Deviney v. Union Pacific Railroad*, the employee was bitten by a mosquito on railroad property with standing water and a pond where mosquitoes could breed.[45]

None of these cases is like the present one. Union Pacific did nothing to attract mosquitoes, indigenous to Brazoria County and all South Texas, to its small right-of-way, and it could do nothing to keep them out. As Nami concedes, "Union Pacific is not liable for Nami's injuries 'for owning land where mosquitoes can live in the dampness and wild grass'".[46] If it were, it would be strictly liable and an insurer of its employees' safety. FELA imposes no such liability.

On the facts before us, the *ferae naturae* doctrine applies, and thus Union Pacific owed Nami no duty to prevent his infection with mosquito-borne West Nile virus. Following carefully the analysis prescribed by the United States Supreme Court in *Gottshall*, we are bound to conclude that as a matter of law, Union Pacific could not be negligent and liable to Nami under FELA.

---

[44] 818 F. Supp. 613, 615 (S.D.N.Y. 1993).

[45] 786 N.W.2d 902, 905 (Neb. 2010).

[46] Nami's Resp. Br. at 13.

\*     \*     \*     \*     \*

Accordingly, we reverse the judgment of the court of appeals and render judgment for Union Pacific.

 

_____

Nathan L. Hecht
Chief Justice

Opinion delivered: June 24, 2016