

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

---

No. 02-21-00244-CV

---

GREG HANSON, Appellant

V.

FORT WORTH & WESTERN RAILROAD COMPANY, Appellee

---

On Appeal from the 96th District Court
Tarrant County, Texas
Trial Court No. 096-316600-20

---

Before Sudderth, C.J.; Bassel and Womack, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I.  Introduction

Appellant Greg Hanson raises a single issue challenging a summary judgment granted to Appellee Fort Worth & Western Railroad Company (the Railroad). Mr. Hanson frames his issue as follows:

> Under the Federal Employers' Liability Act [(FELA)], a railroad owes a legal duty to provide a reasonably safe work environment to its employees.  It breaches that duty when it negligently assigns its employee to perform work beyond his or her physical capacity.  Considering all facts and reasonable inferences in the light most favorable to him, Mr. Hanson was injured when he fell off his truck because of exhaustion—a condition the Railroad knew or reasonably should have known about based on Mr. Hanson's phone calls.  Did the trial court err [by] granting the Railroad's hybrid motion for summary judgment?

To establish that the Railroad had notice of his exhaustion and continued to assign him work that it should have known that he was incapable of performing, Mr. Hanson relies on statements that he made to his supervisor the day before he was injured.  The statements that Mr. Hanson made to his supervisor do not reasonably create the inference that he argues should be drawn from them—that the Railroad should have known that he was being assigned tasks beyond his physical capacity to perform them.  Further, Mr. Hanson seeks to impose a duty on the Railroad to monitor whether he is sufficiently rested to do his job.  To adopt such a duty is contrary to the principles limiting an employer's duty to create safety programs for obvious risks or to warn employees of the risk that because of their experience and

2

the nature of their work they should be aware of. Accordingly, we affirm the trial court's summary judgment that Mr. Hanson take nothing.

## II. Background

### A. Procedural background

The procedural history of this matter is simple. Mr. Hanson sued the Railroad, alleging that he suffered an injury when "[o]n or about April 3, 2019, while working within the scope of his duties as a [roadmaster] for [the Railroad], [he] was injured when he fell from a rail truck and was required to continue working." His petition cataloged the following breaches of duty by the Railroad:

a. failing to provide [him] with a safe place to work;

b. failing to reasonably supervise [its] employees;

c. requiring [him] to work past exhaustion and/or past the time for which it was safe to work;

d. failing to follow safe management practices with the goal of providing [him] a safe work environment;

e. failing to provide adequate equipment;

f. failing to provide [its] employees[] with proper instructions and orders;

g. failing to adequately protect him from dangerous conditions;

h. failing to test or properly evaluate the conditions and equipment with which he was required to work;

i. failing to adopt and enforce proper rules, regulations, and procedures concerning work practices and work areas; and

j. [o]ther acts so deemed negligent and grossly negligent.

After the parties conducted discovery, the Railroad filed a traditional and no-evidence motion for summary judgment, noting that Mr. Hanson's claims had devolved down to one by which he claimed that he had suffered a fall because of exhaustion from the number of hours that he had worked before his fall. The Railroad asserted that a summary judgment that Mr. Hanson should take nothing on his claim was appropriate for the following reasons:

• Foreseeability is an essential element of a FELA negligence claim. Even [Mr.] Hanson could not "envision" anyone getting hurt getting on/off the hi-rail truck if [the Railroad]'s safety rules were followed. Nor did [Mr.] Hanson's complaint about working long hours the day <u>before</u> the incident make his negligence foreseeable the next day. [The Railroad] had no knowledge that [Mr.] Hanson was fatigued or unable to safely perform his job when he was injured or that any dangerous condition existed in its workplace.

• As a matter of law, [the Railroad] had no legal duty to ensure that its employees did not work long hours.

• Because [Mr.] Hanson has admitted that his own negligence was the sole cause of his alleged injury, [the Railroad] has no liability.

Mr. Hanson filed a response that summarized his arguments regarding why the Railroad's motion should be denied as follows:

• There is a genuine issue of material fact on whether [the Railroad] failed to provide a reasonably safe place to work under [FELA] due to [the Railroad's] forcing Mr. Hanson to work excessive hours.[1]

---

[1]As we read Mr. Hanson's briefing, it appears that he is no longer arguing that being assigned long work hours constitutes an act of negligence. His reply brief states,

4

• [The Railroad] was negligent when its employee – Mr. Terrance Daniels, who was Mr. Hanson's supervisor at [the Railroad], forced Mr. Hanson to continue to work beyond exhaustion, even after Mr. Hanson informed Mr. Daniels that he [had] worked 16–17 hours that day already.[2]

The trial court granted the Railroad's motion for summary judgment and ordered that Mr. Hanson take nothing on his claims. Mr. Hanson then filed a notice of appeal.[3]

---

Mr. Hanson has never argued that a railroad need not have notice of an employee's fatigue. To the contrary, citing the same portion of the Second Circuit case that the Railroad also relies on, Mr. Hanson *agreed* that a railroad must have actual or constructive knowledge to trigger the duty of care: "[A]n employer is not liable if it has no reasonable way of knowing that a potential hazard exists[.]"

[2]The record contains no objections to any of the summary-judgment evidence relied on by the parties in the motion or the response.

[3]The Railroad moved to dismiss this appeal because Mr. Hanson voluntarily paid the court costs assessed against him in the trial court's summary-judgment order without expressing an intent to continue his appeal and, thus, the appeal is moot. Mr. Hanson responded with various arguments regarding why he was required to pay the costs and also pointed out that the day his counsel began communicating about paying the costs, he filed his notice of appeal. The voluntary satisfaction of a judgment does not moot an appeal when the party who submits the payment makes clear an intent to continue the appeal. For example, as the First Court of Appeals noted,

[Appellant] relies upon *Highland Church of Christ v. Powell*, 640 S.W.2d 235[, 236] (Tex. 1982), for the proposition that a judgment debtor who voluntarily satisfies a judgment thereby waives the right to appeal. . . . . However, both *Highland Church* and subsequent decisions of the Supreme Court of Texas provide that a judgment debtor may pay a judgment and still appeal, so long as the judgment debtor makes clear its intent to pursue its appellate rights. *Id.* at 236–37; [*see also*] *Marshall v. Hous. Auth. of City of San Antonio*, 198 S.W.3d 782, 787 (Tex. 2006); *BMG*

5

## B. Factual Background

At the time that Mr. Hanson was injured, he had been employed in the railroad industry for almost twenty-six years. His job title with the Railroad was roadmaster. His job duties as roadmaster were to inspect the Railroad's tracks. Mr. Hanson performed these duties by driving a hi-rail truck over the tracks, in Mr. Hanson's case, a Ford F-250. The event that was the basis for Mr. Hanson's claim occurred when he slipped off the edge of the hi-rail truck's running board and caught his fall with his right arm.

The deposition testimony indicated that Mr. Hanson did not have a complaint about the equipment that he was using when he was injured or the Railroad's training and safety policies for using the equipment. Mr. Hanson acknowledged that dismounting from the truck was a regular part of his job responsibilities, that he had climbed on and off the vehicle "a lot," and that he had never had a problem before he was injured on the occasion at issue. The Railroad had specific safety policies in place that covered Mr. Hanson's job duties; one of the policies was to maintain three points

---

*Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 770–71 (Tex. 2005); *Miga v. Jensen*, 96 S.W.3d 207, 211–12 (Tex. 2002). "The Texas rule is not, and never has been, simply that any payment toward satisfying a judgment, including a voluntary one, moots the controversy and waives the right to appeal that judgment." *Miga*, 96 S.W.3d at 211.

*McLaurin v. McLaurin*, No. 01-14-00710-CV, 2016 WL 3023020, at *17 (Tex. App.—Houston [1st Dist.] May 26, 2016, pet. denied) (mem. op.). We do not reach the question of whether the payment of costs constitutes a voluntary payment but deny the motion to dismiss because of the clear intent expressed by Mr. Hanson to continue his appeal, as evidenced by his filing of a notice of appeal.

of contact when dismounting his truck, i.e., "[i]f both of [his] hands [were] holding on to something, . . . one of [his] feet [could move] from one position to the other" or "if both of [his] feet [were] planted, . . . one of [his] hands [could move] from one position to another." The three-points-of-contact rule was one that Mr. Hanson had followed throughout his railroad career. Mr. Hanson agreed that it was usually pretty safe to dismount the truck using the three-point method and that he could not envision slipping when using three points of contact in a normal situation.

The hi-rail truck assigned to Mr. Hanson had "grab handles for getting off, so [that he could] get the three-point contact." The truck was also equipped with a corrugated running board that provided a nonslip surface for placing one foot when dismounting the vehicle. Mr. Hanson was also provided with footwear that enabled him to maintain proper footing as he entered and exited the vehicle. Mr. Hanson testified that he did not think that there was anything unsafe about the truck that he had driven on the day of his injury, that he had "no complaints [about] the equipment[,]" and that he saw no hazardous conditions on it.

At the time of the fall, the vehicle was stopped on the tracks. Mr. Hanson described the height from which he had to step down at the time of his injury as being a "little long" but also that it was the type of step that he made every day. Mr. Hanson described what occurred as follows: "I stopped the truck and I was going to get out, and I slipped on the running board and fell to the ground. It just

7

happened that quick." Mr. Hanson attributed his misstep to being "stressed and tired."

Mr. Hanson began the workweek during which he was injured after having worked one day of the prior week. Mr. Hanson worked on the Monday of the workweek at issue but described that day as normal.

Mr. Hanson attributed his tiredness to long hours that he had been required to work during a two-day period occurring on the Tuesday and Wednesday of his workweek. Mr. Hanson was injured at approximately 7:00 p.m. on Wednesday.

On Tuesday, a federal inspection of the Railroad's tracks began. Workdays during a federal inspection typically required longer work hours, and Mr. Hanson testified that he had had to put in "worse" days during his railroad career than the ones he put in during the day prior to and the day that his injury occurred.

Mr. Hanson's job duty during the inspection was to transport the inspector in his hi-rail vehicle. The inspection process involved "mainly being in [the vehicle] with the [federal] inspector and looking at the track . . . [f]or a lot of hours." Mr. Hanson stated that he was "doing a little bit of work" during the inspection by replacing missing bolts from time to time. Mr. Hanson also had work responsibilities to inspect the work of a "tie gang" that was doing work on the tracks. The inspection process required Mr. Hanson to work 16.5 hours on the Tuesday that the inspection began, with his workday starting at 6:00 a.m. and ending at 10:30 p.m.

If the federal inspector found defects in the track, Mr. Hanson was required to put warning flags out so that a train did not travel over the defective tracks. Apparently, an issue arose late on Tuesday about whether Mr. Hanson had set out the required warning flags. The issue about the flags triggered a disagreement between Mr. Hanson and his supervisor when the supervisor instructed Mr. Hanson to be the one to install the flag.

It was during the Tuesday conversations between Mr. Hanson and his supervisor about the flag that Mr. Hanson claims that he put the Railroad on notice that he was being worked to the point of dangerous exhaustion. What these conversations entailed was documented in a hearing transcript that was apparently prepared as part of Mr. Hanson's claim that he was injured, with the hearing transcript containing Mr. Hanson's supervisor's description of the conversations at issue. Mr. Hanson included the transcript in his summary-judgment response, and we quote the material part of the document describing the flag incident and the communications between Mr. Hanson and his supervisor, using italics to reflect the portions that Mr. Hanson highlighted in his summary-judgment response:

[The Railroad responded as follows:]

April 2 - they started on that day. Clay[4] got two on the first day for concentrated loads. [Mr. Hanson] got one the first day too. The evening of April 2nd, and the end of the first day of inspection, [Mr. Hanson] told me he was going to have to put out a speed restriction

---

[4]The record does not identify Clay, nor does it identify Jared and Gene who are mentioned below.

on his territory up to MP 55. And we talked about that speed restriction being a total of 25 miles long. T [sic] "[Y]ou have to do what you have to do[."] Shortly after that, an hour to an hour and a half, he ([Mr. Hanson]) called me back. [Mr. Hanson] said the [Federal Railroad Administration (FRA)] guy told him[,] "I know you have other violations out there, but you really only need cover from MP 36 to MP 40.["] The other part of the speed restriction was already out for the tie project. We can get the bulletins. With the [b]ulletins out, and the slow order required by the FRA, it would [have] totaled 25 miles. I told him, [Mr. Hanson], I need to go pull that flag back. He started complaining[,] ["]I'm by Cresson, I'm all most home. I'm going to call the dispatcher and see what trains that's going to affect overnight.["] I told him to call me back and let me know. He called me, maybe 20 minutes later[] and said it's only going to affect one train "well [Mr. Hanson], I don't want to hear Jared and Gene's s[--]t, if we don't need to have a 25 mile speed restriction, I don't want it[."] He really started complaining then. He ([Mr. Hanson]) didn't know where his last defect was – I don't know why the FRA guy even called him. The FRA guy is not the governing factor of our railroad – [Mr. Hanson] is the roadmaster of that territory – he needs to know where that last defect was[] and where to put out that speed restriction. If it's a class specific defect, you have to put the slow order out then, slow the trains down. That['s] what the FRA knows. I'm not there, I'm going on what he tells me, and I tell him he has to go get that flag. [*Mr. Hanson*] *said[,] ["]If I go out there, I have to put in 16/17 hours. I'm already over my hours["] – I told him you didn't work but 1-day last week, he ([Mr. Hanson]) said something else, and I told him I don't want to hear it[;] go move the flag back.*

About 15-20 minutes I called him back – I told him hey, where's the gang at – have them go out and move the flag back. [Mr. Hanson] – said that's a good idea, I'll do that. He ([Mr. Hanson]) called back shortly after – and said they (the gang) is almost out of hours and they can't go get the flag – DOT Driver. *I told him he had to go get it. He ([Mr. Hanson]) said something like I might not be at work tomorrow, working to[o] many hours. I ended the call.*

Mr. Hanson returned to work on Wednesday (the day after the documented conversations with the supervisor), which was the day that he suffered the fall from his vehicle. On Wednesday, Mr. Hanson continued to accompany the federal

10

inspector and to inspect the track behind the work of the tie gang. Mr. Hanson began work at 6:00 a.m. and worked for thirteen hours before the fall, which he reported at 7:30 p.m.

When the incident occurred, Mr. Hanson had worked forty hours during the three-day period in question. Mr. Hanson also testified that during that time, he had "been going home and getting good rest at night."

The record does not inventory all the communications between Mr. Hanson and his supervisor on Wednesday, but Mr. Hanson testified as follows about whether he had communicated a concern to his supervisor that he was not a safe employee:

> [Railroad's attorney:] My question is, on the day of this incident, did you tell [the supervisor], ["]I'm too stressed, I've been working too hard and, therefore, I'm not a safe employee["]?
>
> [Mr. Hanson's attorney]: Objection, form.
>
> A. No, I didn't say that.

Though Mr. Hanson testified that he had complained about working long hours to his supervisor, as we read the record, he is referring to the statements that he made to his supervisor on Tuesday.

The supervisor described his communications with Mr. Hanson on the Tuesday and Wednesday in question as follows:

> Q. (BY [Railroad's attorney]) I've got just a couple questions for you, sir. Did [Mr. Hanson] ever say he was too tired to work safely at any time you talked to him during this week when the incident happened?
>
> A. He did not.

11

Q. Did -- the day that [Mr. Hanson] said that he [had] worked a total of 16 to 17 hours, was that the day before this incident?

A. Repeat that.

Q. Sure. Which day was it during that week that [Mr. Hanson] would have allegedly worked 16 to 17 hours?

A. It would have been the day prior to. I believe it would have been the day prior to.

Q. All right. In other words, [Mr. Hanson] didn't injure himself when you told him [that] he needed to go put this flag out that evening?

A. That's correct.

. . . .

Q. Did [Mr. Hanson] ever tell you on the day that his incident happened that he was too tired or fatigued to safely do his work?

A. He did not.

Later, the supervisor reiterated,

Q. Did he ever tell you at any time on Tuesday or when he had to go back out there, or on Wednesday, at the end of the day when he reported to you that he had injured himself, that he was fatigued or incapacitated or in any way couldn't work safely?

A. No.

Q. If he had done so --

[Mr. Hanson's attorney]: Objection, form.

Q. --what would you have done?

[Mr. Hanson's attorney]: Objection, form.

A. I would have not asked him to go back.

12

Q. Okay. Was there ever any indication by Mr. Hanson of any fatigue or incapacity or anything that would prevent him from safely doing his job?

[Mr. Hanson's attorney]: Objection, form.

A. Repeat that.

Q. Is there -- was there ever anything reported to you by [Mr.] Hanson as to any incapacity or fatigue or anything like that to where he couldn't safely do his job?

[Mr. Hanson's attorney]: Objection, form.

A. No.

The parties had clashing narratives on whether it was the employee's burden to make the Railroad aware of exhaustion and whether it was the Railroad's duty to monitor whether an employee could continue to work safely. The Railroad's theme was that Mr. Hanson complained only on Tuesday about the number of hours that he had worked and that without a complaint that Mr. Hanson was tired or fatigued, the supervisor acted appropriately in telling Mr. Hanson to keep working. Other managerial personnel who were responsible for the Railroad's safety stated that it was Mr. Hanson's obligation to report when he was experiencing fatigue, that he was empowered to indicate that he was tired or fatigued, and that the Railroad would respond appropriately to a complaint presented in those terms.

Mr. Hanson's narrative highlighted two themes: (1) a challenge to what he characterized as the Railroad's theory that his "being fatigued from working long hours for [the Railroad] the day before the incident [did] not [make it] foreseeable that

13

he might be still fatigued the next day"; and (2) a contention that "[the Railroad] also appears to be arguing that its employees must utter the exact words 'fatigued' and 'not safe to work' in order to establish foreseeability and [the Railroad]'s duty of care."

In presenting these themes, Mr. Hanson emphasized various aspects of the deposition testimony elicited from the Railroad's managerial personnel. That testimony included the following:

- A statement by the general director of operating practices that he did not think that the Railroad should do anything to ensure that employees are not working past the point of exhaustion other than telling employees to report if they are fatigued.

- Statements by the director of the Railroad's safety department that suggested (1) that he did not consider an employee was unsafe to work unless he was fatigued to the point that he could not get out of bed or hold his eyes open and (2) that he was unconcerned if an employee claimed that he was tired but was told to get the job done. He refused to characterize Mr. Hanson's complaint—that he had worked too many hours on the Tuesday before his injury—as a complaint that should have prompted action.

- Statements by a safety employee regarding the absence of (1) training by the Railroad to assist employees in identifying signs of fatigue in other

14

employees and (2) policies setting the maximum number of hours an employee working in the track group should work during the week.

- Mr. Hanson's supervisor's statement about the Tuesday conversation between him and Mr. Hanson. Mr. Hanson argued that the supervisor's "attitude is very clear: get it done, no matter what. A jury might find that the Railroad—through Mr. Daniels—was negligent in creating an unsafe work environment for its employees by forcing the employees to work beyond exhaustion."

- Testimony suggesting that the Railroad's response to Mr. Hanson during the Tuesday conversation violated the Railroad's policy:

  Q. And would you agree that managers, like Mr. Daniels, should encourage their workers to report fatigue?

  A. Yes. The worker needs to report that if he's fatigued or if he's unsafe to do his job, he needs to report that.

  Q. And when a manager like Mr. Daniels receives a report tha[t] someone is tired, what should he do?

  [The Railroad's attorney]: Objection, form.

  A. He should let that -- or not let that person, but inform that person to get rest and see if he can do his -- perform his job safely. And if he can't, then we'll find something else or he won't work that day, if he's going to be unsafe or if he's fatigued where he can't work safe.

- Testimony that the policy of the Railroad was to "write up" employees for not working eight hours in a day—no matter how many hours that they had

15

worked the prior day—and that Mr. Hanson's supervisor had the same number of employees available to him "regardless [of] whether it's busy or not."

### III. Standard of Review

In a summary-judgment case, the issue on appeal is whether the movant met the summary-judgment burden by establishing that no genuine issue of material fact exists, and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We review a summary judgment de novo. *Travelers Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).

We take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008); *Provident Life & Accident Ins. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). We also consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort*, 289 S.W.3d at 848. We must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all the evidence presented. *See Wal-Mart Stores, Inc. v. Spates*, 186 S.W.3d 566, 568 (Tex. 2006); *City of Keller v. Wilson*, 168 S.W.3d 802, 822–24 (Tex. 2005). For example, in the

16

context of circumstantial evidence, we must test the evidence to ensure the inferences drawn from it are reasonable and do so by applying the following analytical template:

> "An inference is not reasonable if it is susceptible to multiple, equally probable inferences, requiring the factfinder to guess in order to reach a conclusion." *Suarez v. City of Tex. City*, 465 S.W.3d 623, 634 (Tex. 2015). A jury "may not reasonably infer an ultimate fact from meager circumstantial evidence which could give rise to any number of inferences, none more probable than another." *Kingsaire, Inc. v. Melendez*, 477 S.W.3d 309, 313 (Tex. 2015) (quoting *Hancock v. Variyam*, 400 S.W.3d 59, 70–71 (Tex. 2013)). If a claim is "supported only by meager circumstantial evidence, the evidence does not rise above a scintilla (and thus is legally insufficient) if jurors would have to guess whether a vital fact exists." *Wilson*, 168 S.W.3d at 813. "Thus, when the circumstantial evidence of a vital fact is meager, a reviewing court must consider not just favorable but all the circumstantial evidence, and competing inferences as well." *Id.* at 814. In such a case, the record must contain "something else" that corroborates the probability of the inferred fact's existence or non-existence. *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 729 (Tex. 2003).

> Multiple inferences may be drawn from a single fact situation, and circumstantial evidence can thus give rise to separate inferences, each of which supports a different element of a claim. *See McClure v. Allied Stores of Tex., Inc.*, 608 S.W.2d 901, 904 (Tex. 1980); *Farley v. MM Cattle Co.*, 529 S.W.2d 751, 756 (Tex. 1975). However, an inference stacked only upon other inferences, rather than supported by direct evidence, is not legally sufficient evidence. *See Pitzner*, 106 S.W.3d at 728. An inference is not reasonable "if it is premised on mere suspicion—some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence." *Suarez*, 465 S.W.3d at 634 (cleaned up). And, if the evidence allows for "only one inference, neither jurors nor the reviewing court may disregard it." *Wilson*, 168 S.W.3d at 822.

17

*Miller v. Superior Forestry Serv., Inc.*, No. 03-17-00043-CV, 2018 WL 4039562, at *2 (Tex. App.—Austin Aug. 24, 2018, pet. denied) (mem. op.).[5]

For a traditional summary judgment, a defendant that conclusively negates at least one essential element of a plaintiff's cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010). Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence that raises a fact issue. *Phan Son Van v. Peña*, 990 S.W.2d 751, 753 (Tex. 1999).

With regard to no-evidence motions for summary judgment, after an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that no evidence supports an essential element of the nonmovant's claim or defense. Tex. R. Civ. P. 166a(i). The motion must specifically state the elements for which no evidence exists. *Id.*; *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The trial court must grant the motion unless the nonmovant produces summary-judgment evidence that raises a genuine, material fact issue. *See* Tex. R. Civ. P. 166a(i) & 1997 cmt.; *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008).

---

[5]The term "inference stacking" has come under criticism. *See* Chad Baruch, David J. Fisher & Jefferson Fisher, *Knives Out: A Call For The Supreme Court Of Texas To Abolish The So-Called "Rule" Against Inference Stacking*, 52 Tex. Tech. L. Rev. 705, 705–23 (Summer 2020). No matter *Miller*'s use of the term, it concisely set out the standard that we should apply in deciding whether inferences may be properly drawn.

When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, again indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006). We review a no-evidence summary judgment for evidence that would enable reasonable and fair-minded jurors to differ in their conclusions. *Hamilton*, 249 S.W.3d at 426 (citing *Wilson*, 168 S.W.3d at 822). We credit evidence favorable to the nonmovant if reasonable jurors could, and we disregard evidence contrary to the nonmovant unless reasonable jurors could not. *Timpte Indus.*, 286 S.W.3d at 310 (citing *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006)). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003).[6]

## IV. Analysis

As we noted in this opinion's introduction, Mr. Hanson argues in his sole issue that the trial court erred by granting the Railroad's hybrid motion for summary

[6]We should generally review the ruling on a no-evidence motion for summary judgment first, and "if no claims survive a no-evidence review, a review of the traditional motion becomes moot." *Littleton v. Nationstar Mortg. L.L.C.*, No. 02-19-00238-CV, 2020 WL 1949623, at *4 (Tex. App.—Fort Worth Apr. 23, 2020, pet. denied) (mem. op.). But we may combine our review if it will make our review of the similar grounds raised in the no-evidence and traditional motions for summary judgment more concise. *See id.*; *see also Bradford v. Tex. Health Harris Methodist Hosp.*, No. 02-20-00357-CV, 2021 WL 1800181, at *3 (Tex. App.—Fort Worth May 6, 2021, pet. denied) (mem. op.) (same). We will combine our review in this case.

19

judgment. Specifically, Mr. Hanson argues that considering all the facts and reasonable inferences in the light most favorable to him, he was injured when he fell off his truck because of exhaustion—a condition that he claims the Railroad knew or reasonably should have known about based on his phone calls. Because the facts do not reasonably create the inferences that Mr. Hanson claims and because he seeks to impose a duty on the Railroad that is contrary to the principles that limit an employer's duty to create safety programs for obvious risks and experienced employees, we uphold the trial court's summary judgment.

## A. We set forth the elements of a FELA cause of action.

As noted, Mr. Hanson's claim is not a common-law negligence claim brought under Texas law but one under FELA. *See* 45 U.S.C.A. § 51. Stripped of verbiage that does not apply to Mr. Hanson's claim, the material provisions of the FELA provide that "[e]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury . . . resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." *Id.*

Citing the United States Supreme Court, the Texas Supreme Court has outlined the similarities and differences between a claim under FELA and general common-law principles of negligence. *Union Pac. R.R. Co. v. Nami*, 498 S.W.3d 890, 894–96 (Tex. 2016). The similarities lie in the liability element, as *Nami* explained,

20

But with respect to FELA's liability element, the Supreme Court explained in *Consolidated Rail Corp. v. Gottshall*[, 512 U.S. 532, 556, 114 S. Ct. 2396, 2411 (1994),] that while "Congress'[s] goal in enacting [FELA was] alleviating the physical dangers of railroading[,"]

> FELA is . . . not . . . a workers' compensation statute. . . . FELA does not make the employer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur. And while what constitutes negligence for the statute's purposes is a federal question, we have made clear that this federal question generally turns on principles of common law: [FELA] is founded on common-law concepts of negligence and injury, subject to such qualifications as Congress has imported into those terms. Those qualifications . . . are the modification or abrogation of several common-law defenses to liability, including contributory negligence and assumption of risk. Only to the extent of these explicit statutory alterations is FELA an avowed departure from the rules of the common law. Thus, although common-law principles are not necessarily dispositive of questions arising under FELA, unless they are expressly rejected in the text of the statute, they are entitled to great weight in our analysis.

*Id.* at 894 (footnotes omitted).

Looking to the principles outlined in *Gottshall*, *Nami* set out its overview of how to decide whether a railroad breached a duty and committed negligence as follows:

> We track *Gottshall*'s analysis in this case. In applying FELA, we look to the common law, not of Texas or any particular jurisdiction, but in general. The Supreme Court has stated that "[a] railroad has a duty to use reasonable care in furnishing its employees with a safe place to work [that] was recognized at common law[] [and] is given force through [FELA]." These fundamental common-law principles apply. First, negligence means the failure to use ordinary care—failing to do what a reasonable person like the defendant would have done under the same or similar circumstances—to protect against unreasonable risk of harm.

21

Second, "an employer's duty to provide a safe workplace . . . always exists[.]"

*Id.* at 895–96 (footnote omitted).

An integral part of the question of duty under the FELA is foreseeability. As the United States Supreme Court has noted,

> "[R]easonable foreseeability of harm," . . . is indeed "an essential ingredient of [FELA] *negligence.*" The jury, therefore, must be asked, initially: Did the carrier "fai[l] to observe that degree of care which people of ordinary prudence and sagacity would use under the same or similar circumstances[?]" In that regard, the jury may be told that "[the railroad's] duties are measured by what is reasonably foreseeable under like circumstances." Thus, "[i]f a person has no reasonable ground to anticipate that a particular condition . . . would or might result in a mishap and injury, then the party is not required to do anything to correct [the] condition." If negligence is proved, however, and is shown to have "*played any part, even the slightest, in producing the injury,*" then the carrier is answerable in damages even if "the extent of the [injury] or the manner in which it occurred" was not "probable" or "foreseeable."

*CSX Transp., Inc. v. McBride*, 564 U.S. 685, 703–04, 131 S. Ct. 2630, 2643 (2011) (citations and footnotes omitted).

The Texas Supreme Court formulated the impact of foreseeability on the question of duty as follows:

> The standard of care that a railroad must meet "must be commensurate to the dangers of the business." Thus, an "essential ingredient" of the defendant's duty to use reasonable care is whether the railroad could have reasonably foreseen a harm. The defendant's duty is "measured by what a reasonably prudent person would anticipate as resulting from a particular condition."

*Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002) (citations omitted).

The main difference between a common-law negligence claim and a FELA claim is the element of causation:

> The causation element of a FELA action is a sharp departure from the common-law requirement of proximate cause. The United States Supreme Court in *CSX Transportation, Inc. v. McBride* recently explained[,]
>
>> FELA's language on causation . . . is as broad as could be framed. Given the breadth of the phrase "resulting in whole or in part from the [railroad's] negligence," and Congress'[s] humanitarian and remedial goals, . . . in comparison to tort litigation at common law, a relaxed standard of causation applies under FELA. . . . Under FELA[,] the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought.

*Nami*, 498 S.W.3d at 894 (footnote omitted).

### B. We set forth the principle that a railroad should not assign an employee work duties that the Railroad knows or should have known are beyond the employee's physical capabilities.

In analyzing a railroad's duty to create a safe working environment, the El Paso Court of Appeals has explained what triggers a duty to address a worker's ability to perform job duties:

> The ultimate question is whether the railroad exercised reasonable care in creating a reasonably safe working environment. [*Rivera v. Union Pac. R.R. Co.*, 378 F.3d 502, 507 (5th Cir. 2004)] (citing *Urie* [*v. Thompson*], 337 U.S. [163,] 17[8] n.16, 69 S. Ct. 1018[, 1028 (1949)]). The railroad's duty to create a reasonably safe work environment encompasses a duty to assign an employee to work for which he or she is reasonably suited. *Id.* (citing *Emmons* [*v. S. Pac. Transp. Co.*], 701 F.2d [1112,] 1120 [(5th Cir. 1983)]). The railroad breaches that duty if it negligently assigns an employee to perform work beyond his physical capacity, or, in other words, if the railroad knew or should have known of the employee's

diminished work capacity and, despite that knowledge, continued to assign the employee to tasks that it knew or should have known would aggravate his physical condition. *Id.* However, the railroad is not an insurer of its employees' safety. . . . *Gottshall*, 512 U.S. [at] 543, 114 S. Ct. [at] 2396, 2404 . . . . Therefore, the railroad generally has no duty to ascertain whether an employee is fit for a particular job, absent notice to the contrary. *See, e.g., Fletcher* [*v. Union Pac. R.R. Co.*], 621 F.2d [902,] 909 [(8th Cir. 1980)].

*Ragland v. BNSF Ry. Co.*, 501 S.W.3d 761, 780 (Tex. App.—El Paso 2016, no pet.).

A court outside of Texas echoed that a railroad should not assign work duties that it knows or should have known are beyond the physical capabilities of the employee:

Among other things, Amtrak "has a duty to assign employees to work for which they are reasonably suited[, . . . and it] breaches that duty if it negligently assigns an employee to perform work beyond his capacity." *Fogg v. Nat'l* [*R.R.*] *Passenger Corp*, 585 A.2d 786, 789 (D.C. 1991) (citations and quotation marks omitted). "The railroad is negligent if it knew or should have known that its assignment exposed the employee to an unreasonable risk of harm." *Id.* In other words, the jury must focus on whether "the [railroad] knew or should have known of the [employee's] diminished work capacity and in spite of that knowledge . . . unreasonably continued to assign [the employee] to tasks that [the railroad] knew or should reasonably have known would aggravate her physical condition." *Id.* (approving jury instructions)[; *see*] *Nat'l* [*R.R.*] *Passenger Corp. v. Krouse*, 627 A.2d 489, 495 n.10 (D.C. 1993) (construing *Fogg*).

*Jones v. Nat'l R.R. Passenger Corp.*, 942 A.2d 1103, 1106–07 (D.C. 2008). We apply the standards of *Raglan* and *Jones* because Mr. Hanson's argument is that he had a diminished physical capacity to work due to exhaustion and yet the Railroad assigned him tasks that it should have known that he was not capable of performing safely.

24

**C.** **We set forth the principles that apply to limit the duties of an employer to establish safety standards for obvious hazards and to train an employee about obvious hazards, such as those of fatigue.**

An employer also has a duty to adopt adequate rules to warn workers of the hazards of their employment and to supervise their activities, but the extent of that duty corresponds to the nature of the dangers associated with the work, how obvious the dangers are, and the experience of the employee. Specifically,

> [a]lthough an employer is not an insurer of its employee's work safety, it has a duty to use ordinary care in providing a safe place to work. *Leitch v. Hornsby*, 935 S.W.2d 114, 117 (Tex. 1996). This duty includes providing rules and regulations for the safety of employees, warning employees of the hazards of their employment, and supervising employees' activities. *Farley . . .* , 529 S.W.2d [at] 754 . . .; *Nat'l Convenience Stores, Inc. v. Matherne*, 987 S.W.2d 145, 149 (Tex. App.— Houston [14th Dist.] 1999, no pet.). An employer has no duty, however, to adopt safety rules when its business is neither complex nor hazardous or when the dangers incident to the work are obvious or are of common knowledge and are fully understood by the employee. *Matherne*, 987 S.W.2d at 149. Similarly, the duty to warn or to caution an employee of a danger arises when (1) the employment is of a dangerous character requiring skill and caution for its safe and proper discharge and (2) the employer is aware of the danger and has reason to know that the employee is unaware of the danger. *Id.* An employer's duty to instruct applies to an inexperienced employee[] but not to one who is experienced in the work that he is assigned. *Farley*, 529 S.W.2d at 754; *Matherne*, 987 S.W.2d at 149. Thus, the age and experience of the employee should be considered in measuring the employer's duty. *Farley*, 529 S.W.2d at 754; *see also Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 186 (Tex. 2004).

*Wald-Tinkle Packaging & Distrib., Inc. v. Pinok*, No. 01-02-01100-CV, 2004 WL 2966293, at *4 (Tex. App.—Houston [1st Dist.] Dec. 23, 2004, no pet.) (mem. op.); *see also Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006) (stating that employer "owes

no duty to warn of hazards that are commonly known or already appreciated by the employee").

The Texas Supreme Court has applied the principles outlined above when addressing the obligation to create safety rules regarding worker fatigue as follows:

> Having held that there is no employer duty with respect to off-duty accidents involving fatigue, we also decline to create a new duty requiring employers to train employees about fatigue.
>
> In the employment context, an employer has a duty to "warn an employee of the hazards of employment and [to] provide needed safety equipment or assistance." *Jack in the Box, Inc. v. Skiles*, 221 S.W.3d 566, 568 (Tex. 2007) . . . (quoting *Kroger Co.* . . . , 197 S.W.3d [at] 794 . . . ). The employee's age and experience in the work he is assigned should also be considered. *See Allen v. A & T Transp. Co.* . . . , 79 S.W.3d 65, 70 (Tex. App.—Texarkana 2002, pet. denied) (citing *Farley* . . . , 529 S.W.2d [at] 754 . . . ). However, the employer "owes no duty to warn of hazards that are commonly known or already appreciated by the employee." *Skiles*, 221 S.W.3d at 568–69 (quoting *Kroger Co.*, 197 S.W.3d at 794, and holding that an employer had no duty to warn an employee about the dangers associated with using a ladder to jump over a lift gate, which was "common and obvious to everyone"); *see also Praesel* [*v. Johnson*], 967 S.W.2d [391,] 398 [(Tex. 1998)] (declining to impose a duty on doctors to warn epileptic patients not to drive because "the risk that a seizure may occur while driving and the potential consequences should be obvious to those who suffer from epilepsy"); *Wilhelm v. Flores*, 195 S.W.3d 96, 98 (Tex. 2006) . . . (holding that there is no duty to warn about dangers of bee stings); *Kroger Co.*, 197 S.W.3d at 795 (holding that there is no duty to warn about dangers of using a vehicle doorjamb for leverage); *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 382 (Tex. 1995) (holding that there is no duty to warn of "obvious risks" that are common knowledge). Likewise, we do not impose a duty to train employees regarding the commonly-known dangers of driving while fatigued. *See J & C Drilling Co.* [*v. Salaiz*], 866 S.W.2d [632,] 638 [(Tex. App.—San Antonio 1993, no writ)] (rejecting argument that employer had a duty to instruct worker "on when to call for relief or how long to rest before driving the company car"); *Matherne*, 987 S.W.2d at 150–52 (rejecting duty to train employee regarding fatigued driving on the job,

and holding that employer has no duty to warn or instruct an employee "with regard to dangers that are ordinarily incident to driving a vehicle and require no special skills or knowledge other than that expected of all licensed drivers").

*Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 412–13 (Tex. 2009). Thus, in assessing the nature of the duty owed by the Railroad to Mr. Hanson, we apply (1) the template of *Pinok* and *Nabors* that calibrates the duty owed to the nature of the dangers and the experience of the employee and (2) *Nabors*'s limitations on the duties regarding worker fatigue.

## D. The trial court properly granted summary judgment that Mr. Hanson take nothing on his claims against the Railroad.

This case boils down to the effect of two statements made by Mr. Hanson to his supervisor on the day before he was injured when he was instructed on Tuesday to place the warning flag that he had failed to place earlier: (1) "If I go out there, I have to put in 16/17 hours. I'm already over my hours," and (2) "I might not be at work tomorrow, working to[o] many hours."

The essence of Mr. Hanson's argument regarding why the trial court erred by granting summary judgment is that the statements that he made to his supervisor triggered the following inference of knowledge on the part of the Railroad:

> As a matter of logic and experience, if an employer knows that its employee has worked the equivalent of two full workdays in one day and [if] the employee has told his boss that he might not be coming into work the next day, [then] *one may reasonably infer that the reason is that he will be too exhausted to work.* [Emphasis added.]

Mr. Hanson sees this inference as reasonable in the face of the following:

27

- The quoted statements do not state that Mr. Hanson has reached a point of exhaustion that made it unsafe for him to perform his job duties.

- The action that he suggested that he might take in response to the amount of work he performed on Tuesday when he had allegedly "work[ed] to[o] many hours" did not occur; he came to work the next day.

- Over the course of the next day after he made the quoted statements, he made no complaint that he was so exhausted that he could not safely work; that he could not perform the task of transporting the inspector in his truck; or that he might injure himself by having his foot slip while performing the routine task of dismounting from his truck (which had adequate safety features), despite being adequately trained to safely perform the task of dismounting the vehicle.

- Mr. Hanson had decades of experience working for railroads, and that experience included long days while a federal inspection was occurring.

- The Railroad had a safety policy in place to relieve employees who had reported that they were too fatigued to work safely.

- Though Mr. Hanson criticized certain aspects of the Railroad's safety policy dealing with complaints of exhaustion, he raises no issue that some aspect of the policy prevented him from making a complaint about exhaustion.

We agree with Mr. Hanson that the summary-judgment standard of review requires that we draw all reasonable inferences from the evidence, but we disagree that the inference that he would have us draw is reasonable. Again, in the quoted statements, Mr. Hanson did not say, even in general terms, that he was too fatigued to perform his work. Thus, the statements at the time they were made did not convey that Mr. Hanson had reached a point of physical exhaustion that rendered him incapable of performing his assigned job duties. Mr. Hanson's brief criticizes such a conclusion as requiring employees to use "magic words" in order to express when

28

they are too tired to work safely. We are not requiring magic words, but we do conclude that for an employee to charge his employer with notice that the employee has reached the point that he feels he cannot work safely, the statement should convey more than the general complaint made by Mr. Hanson about the number of hours he had worked.

And Mr. Hanson certainly did not say on Tuesday that he had reached the point where he lacked the physical capabilities to perform his assigned work task of transporting the inspector the next day—which he knew from experience would be long—and being required to dismount his truck as he did routinely during the course of a workday. So, he states his conclusion that there is an inference of knowledge that he could not safely perform those tasks but leaves unexplained how his statements imparted notice of dangerous fatigue after he had ended his long day on Tuesday without incident, apparently went home and rested, and then almost twenty-four hours had elapsed between the time of his vague complaint about working the number of hours he worked on Tuesday and the time of his injury with no further complaint about fatigue.

Apparently, the trigger for notice of his exhaustion to the Railroad is his statement that he "*might not be at work tomorrow, working to*[o] many hours." [Emphasis added.] The inference being that the Railroad was on notice because he expressed on Tuesday the thought that he might not come to work on Wednesday because he was too exhausted to safely work that day. But he ignores how the

29

inference that he claims is created by his statement is impacted by the fact that he came to work on Wednesday. Again, he never explains how this inference that he seeks to draw survives conduct that was at odds with the action that he stated that he would take in response to his long day on Tuesday. He also never explains how the inference that he seeks to draw is reasonable when he not only came to work on Wednesday but also made no complaint during the course of that day that he was too exhausted to perform the work duties that he knew he would have during the continuation of the federal inspection.

We agree that the law provides that a duty arises "if the railroad knew or should have known of the employee's diminished work capacity and, despite that knowledge, continued to assign the employee to tasks that it knew or should have known would aggravate his physical condition." *See Ragland*, 501 S.W.3d at 780. But here, Mr. Hanson spins out the following

- An inference based on a premise that his statements of Tuesday that suggested that he had a diminished capacity for work when those statements did not contain that statement.

- And then a further inference based on the premise that the Railroad should have known that he was exhausted when he said that he might not come to work the next day, but contrary to his statement, he came to work on Wednesday, knowing that it entailed a long day.

30

- And then yet a further inference based on the premise that even though he came to work when he said he might not, the Railroad still should have known that he was dangerously exhausted even though he worked throughout Wednesday with no further complaint.

The inferences that Hanson seeks to draw from his statements on Tuesday to his supervisor are simply too attenuated from the meager evidence that he uses to support them to be reasonable to establish the ultimate fact that he contends that they should establish—that the Railroad should have known that he was too exhausted to perform the type of duties that he was expected to perform on Wednesday and should have taken some action to address his incapacity. *See Miller*, 2018 WL 4039562, at *2.

Apparently, Mr. Hanson also seeks to impose a duty on the Railroad to monitor his continued fitness to work; he predicates such duty on the fact that he had worked long hours on Tuesday. Specifically, he argues,

> Taking all facts and reasonable inferences in the light most favorable to Mr. Hanson, a jury could find that the Railroad knew that a person complaining of having worked 16 to 17 hours would be exhausted if forced to work the next day. At minimum, the Railroad had a duty that night to make *some* inquiry.

In other words, Mr. Hanson argues that the Railroad should have instituted a policy to monitor whether he was too fatigued to work. As we have noted, an employer carries a duty to warn and create safety policies that are calibrated based on the danger of the work involved and the experience of the employees. *See Pinok*, 2004 WL 2966293, at *4. Further, an employer has no duty to warn an employee about the dangers of

31

fatigue by training about the effects of fatigue. *Escoto*, 288 S.W.3d at 412–13. Because the Railroad knew that Mr. Hanson had worked long hours the day before, he wants to place the duty on the Railroad rather than himself for the responsibility of ensuring that he—though he made no complaint of fatigue on the day that he was injured—was making the right decision to continue to work. The nature of the duty advocated by Mr. Hanson places burdens on the employer that are contrary to the restraints on the duty that we have outlined and seeks to shift onto an employer the responsibility that an employee of Mr. Hanson's type has to monitor his own fitness to work.

## V.  Conclusion

We overrule Mr. Hanson's single issue challenging the trial court's summary-judgment order, and we affirm the trial court's summary judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered:  April 7, 2022

32